*1206
 
 SETH, Circuit Judge.
 

 Steven Zimmerman appeals his conviction for participating in a conspiracy to defraud between July 1, 1985 and April 1, 1988. Appellant was charged in two counts of a fifty count indictment involving twelve other alleged co-conspirators. Other co-conspirators charged included his law firm, his law partner, one of his law associates, and various law firm clients.
 

 Zimmerman was charged with conspiring to defraud in violation of 18 U.S.C. § 371 (count 1), and using the United States mails in furtherance of the fraud in violation of 18 U.S.C. §§ 2 and 1341 (count 50). He was tried in a joint trial with co-defendant Tom Brown (No. 90-1256). The mail fraud charge was dismissed on the government’s motion during the government’s case in chief. The jury found appellant guilty on the conspiracy count.
 

 Appellant raises four issues in his appeal. First, he challenges the sufficiency of the evidence supporting the conspiracy conviction. Second, he contends that the trial court erred by allowing the legal opinions of two bankruptcy judges into evidence. Third, Zimmerman argues that the trial court committed reversible error when it failed to answer jury questions during deliberations regarding whether appellant could be convicted for his failure to report a crime. Fourth, appellant contends that the district court erroneously calculated his offense level under the sentencing guidelines. For the reasons that follow we reverse the trial court and remand the case for a new trial.
 

 Background
 

 Due to the complex and extensive nature of the conspiracy charged by the government, we limit our discussion of the facts to those particularly relevant to appellant. We consider the evidence as we must in the light most favorable to the government.
 

 Appellant Steven Zimmerman and co-defendant David Schwartz were the two partners in the law firm of Zimmerman & Schwartz during the time charged in the conspiracy — July 1, 1985 to April 1, 1988. The firm employed between six to ten associate attorneys. One of those associates, co-defendant Tom Brown, was tried with appellant.
 

 The conspiracy charged against appellant centers on his knowledge of the activities of Gary and Marcee Levine, law firm clients of his partner Schwartz, and who were involved in bankruptcy proceedings. The Levines owned and operated Levines Home Furnishings, a retail furniture store located in the Denver, Colorado area. The corporate name used by Levines Home Furnishings was Sofa Gallery, Inc. The conspiracy charge basically alleged that the law firm trust account was used to conceal funds of the debtors from the bankruptcy court and creditors in the bankruptcy proceedings.
 

 1985
 

 The facts pertinent to the appeal are as follows. On or around July 1, 1985, the Levines and/or Sofa Gallery Inc., were referred to Zimmerman & Schwartz for advice regarding payment of creditors. Between 1975 and 1985, Sofa Gallery, Inc. under-estimated inventory values used to secure credit. This resulted in an approximately $1.5 million difference between money borrowed and actual assets.
 

 Zimmerman and Schwartz met and determined that Schwartz would handle the Le-vines’ representation. Zimmerman had taken two major cases and was planning an extended vacation outside the United States during August 1985. Schwartz accepted the Levines’ case and advised them to hire Sales Results and its principal Stanley Lansing to conduct a liquidation sale. Sofa Gallery, Inc.’s two principal creditors, Cherry Creek National Bank and Westinghouse Credit Corporation (subsequently known as Chrysler First Leasing Corporation), agreed to the sale which was conducted between July and December 1985. Both creditors released their secured interests in the unsold inventory so the sale could proceed and financed the acquisition of over two million dollars in additional inventory for the sale.
 

 
 *1207
 
 Sometime during the liquidation sale, Lansing, who was conducting the sale, and the Levines entered into an undisclosed agreement, apparently approved by Schwartz, whereby Lansing agreed to pay Marcee Levine
 
 lh
 
 of his 10% commission from the gross proceeds of the sale. On the advice of Schwartz, Gary Levine received none of this money because of his impending bankruptcy. Lansing paid Mar-cee Levine $100,614.51 during the course of the sale. This money was deposited in the Zimmerman & Schwartz law firm trust account. About $150,000 of preliquidation accounts receivable proceeds of Sofa Gallery, Inc. had previously been deposited in the trust account. The liquidation sale resulted in a reported net loss of $217,000.00 with only limited proceeds going to the creditors.
 

 The testimony at trial established that in 1985 appellant had two or three contacts with the Levines’ case after the initial discussion with Schwartz about whose clients the Levines would be. The first contact was a conversation in the hallway of the law firm in late July. Schwartz asked Zimmerman if the corporate preliquidation accounts receivable, referred to above, could be placed in the firm trust account when the secured creditors had not made a demand for the collateral or declared the note in default. Zimmerman responded that he thought it was appropriate but that Schwartz should research the question to be sure it was proper. Zimmerman testified that his approval of the use of the trust account in this manner was an “off-the-cuff opinion” which was why he suggested research be done. He stated that he did not see the notes held by the secured creditors and did not know who the secured creditors were.
 

 In late October or early November 1985, Schwartz asked Zimmerman to call A1 Jones at Colorado National Leasing and set up a meeting between Jones, Schwartz and Zimmerman regarding the continued use of forklifts leased by Colorado National Leasing to Sofa Gallery, Inc. The forklifts were needed for the liquidation sale. Zimmerman testified that at the meeting, Schwartz convinced Jones to intercede with the leasing company to allow the forklifts to remain at Sofa Gallery, Inc. even though back rent was due. Zimmerman stated that he was present at the meeting and that he listened to the discussion between Jones and Schwartz. Jones, on the other hand, testified that he did not recall Schwartz being present at the meeting.
 

 The final possible contact in 1985 was on December 13. Zimmerman’s client billing sheet refers to an entry billing 0.5 hours to the Levines for a “conference with client.” Zimmerman testified that he did not recall this meeting and that he could not explain why this notation appeared on the billing statement. The evidence showed that on this day two checks in amounts of $8,000.00 and $7,614.91 payable to Marcee Levine were drawn against the law firm trust account. No connection was shown between the conference and the checks except the inference from the timing. Appellant did not sign the checks.
 

 1986
 

 Appellant’s 1986 contacts with the Le-vines were also limited. The government argues that appellant was indirectly linked to a February 19, 1986 meeting between Schwartz, co-defendant Brown, the Levines and Stephen Forsey. The meeting was to discuss the capitalization of a liquidation business known as Action Sales Group with Gary Levine and Forsey acting as one-half owners. The Levines agreed to capitalize the new company with approximately $300,000.00 in their employees’ pension money.
 

 Appellant was not present at this meeting. Evidence was introduced, however, showing that appellant wrote a check on the trust account for $2,692.38 on February 19 to Cherry Creek National Bank. Appellant testified that he was told by a bookkeeper or someone at the firm to write the check because Cherry Creek had made a demand for its collateral on the Sofa Gallery, Inc. note.
 

 On March 5, 1986, Elizabeth Greenberg, representing Chrysler First (the successor to Westinghouse as a Levine creditor),
 
 *1208
 
 wrote Schwartz and demanded an accounting of the Levine monies received at the law firm. Schwartz wrote back on March 12, 1986 declining to provide such an accounting. No evidence was introduced showing that Zimmerman knew of this letter.
 

 1987
 

 Zimmerman did become involved with Chrysler First when it filed a suit against the law firm for civil damages based on criminal conversion. Chrysler First’s complaint alleged that Sofa Gallery, Inc. monies were being used to pay attorney fees. Upon receipt of the claim, Zimmerman retained an attorney, Jay Horowitz, and contacted his insurance carrier regarding a possible claim. Zimmerman attended a meeting in early 1987 with Horowitz and Greenberg where the conversion lawsuit was discussed. Greenberg testified that she again asked for an accounting and Zimmerman refused. She stated that Zimmerman was angry and concerned that Chrysler would think there was something wrong with the way his law firm used the money. The lawsuit was ultimately abandoned when Chrysler First decided not to pursue the claim.
 

 The remaining testimony concerning appellant’s position in 1987 centers around his notice that a conspiracy relating to the firm’s trust fund may have existed. In June or July of 1987, Robert Breindel, an associate lawyer at Zimmerman & Schwartz, testified that he overheard a conversation between Zimmerman, Schwartz and co-defendant Brown regarding the trust fund. Breindel stated that Brown confronted both partners in the hall of the law firm and asked them why there was no record of the Levine trust ledger. Brown also asked why Sofa Gallery, Inc. accounts receivable monies were being placed in the trust account. Breindel testified that “[a]t that point I overheard Mr. Zimmerman say that as to the accounts receivable, he said that we — the quote is something to the effect that, ‘We had agreed from the beginning that’s how we were going to handle it.’ ”
 

 On October 5,1987, the evidence is undisputed that appellant was present when evidence concerning the Levines' use of the law firm trust account was introduced at a bankruptcy hearing in front of Judge Matheson. Appellant heard the bankruptcy judge state that the firm was either engaged in unethical conduct or might have conspired to defraud the creditors by concealment of funds of the bankrupt. Appellant testified that after hearing this, he was embarrassed and outraged and that he spoke with both Schwartz and Brown about the trust account.
 

 During November 1987, appellant met for a second time with A1 Jones to discuss a settlement of the monies owed Colorado National Leasing. Jones contacted Zimmerman after Jones received a copy of the transcript from the bankruptcy hearing. Zimmerman told Jones that he would look into the problem and get back to Jones with an answer. Roger Barrick, one of the senior associates at Zimmerman & Schwartz, testified that appellant was reluctant to settle the case because he believed there had been no wrongdoing.
 

 On December 10, 1987, Zimmerman attended a deposition of Schwartz by Colorado National Leasing. Zimmerman was acting solely as an observer. At that deposition, Schwartz was asked if he knew that six checks representing money from the liquidation sale were placed in the trust account. Schwartz stated that he did not know about the payments as they came into the account. Schwartz was also asked what happened to the liquidation sale money. Schwartz testified that this money was paid out for the benefit of the corporation. Zimmerman was silent during the deposition.
 

 Sufficiency of the Evidence
 

 Appellant argues that there is insufficient evidence to support the jury’s verdict that he was involved in a conspiracy to defraud the United States. In reviewing the sufficiency of the evidence, we “view the proof presented in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and
 
 *1209
 
 circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt.”
 
 United States v. Sullivan,
 
 919 F.2d 1403, 1431 (10th Cir.1990). While a conspiracy conviction can be inferred from the facts and circumstances of the case,
 
 United States v. Kendall,
 
 766 F.2d 1426, 1431 (10th Cir.1985), “ ‘caution must be taken that the conviction not be obtained “by piling inference upon inference.” ’ ”
 
 United States v. Fox,
 
 902 F.2d 1508, 1513 (10th Cir.1990) (quoting
 
 United States v. Butler,
 
 494 F.2d 1246, 1252 (10th Cir.1974)) (quoting
 
 Direct Sales Co. v. United States,
 
 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943)).
 

 Under 18 U.S.C. § 371, a conviction for conspiracy requires that the government prove beyond a reasonable doubt that (1) there was an agreement between two or more people, (2) to defraud the United States and (3) an overt act was committed by one of the conspirators in furtherance of the agreement.
 
 See United States v. Schmick,
 
 904 F.2d 936, 941 (5th Cir.1990). The defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role,
 
 United States v. Savaiano,
 
 843 F.2d 1280, 1294 (10th Cir.1988), provided the evidence supports the conclusion that the defendant knowingly and voluntarily became a part of the conspiracy.
 
 Fox
 
 902 F.2d at 1514. As we recently reiterated, “ ‘ “[t]he connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt.” ’ ”
 
 United States v. Tranakos,
 
 911 F.2d 1422, 1430 (10th Cir.1990) (quoting
 
 Savaiano,
 
 843 F.2d at 1294) (quoting
 
 United States v. Batimana,
 
 623 F.2d 1366, 1368 (9th Cir.1980)). Appellant's appeal focuses on the evidence connecting him to the overall conspiracy.
 

 After carefully reviewing all the evidence in the light most favorable to the government, we must conclude that there is substantial evidence by which a jury might have found appellant guilty beyond a reasonable doubt. However, we agree with the appellant that the government s case against him was at best tenuous.
 

 No direct evidence was introduced connecting Zimmerman to the misuse of the trust account. There were inferences arising from appellant’s position and the timing of certain events. In denying appellant’s motion for judgment of acquittal notwithstanding the verdict, the district court stated that it viewed Robert Breindel’s testimony as the critical evidence against appellant. The court focused on Zimmerman’s alleged statement to Schwartz and Brown regarding the trust fund. “We had agreed from the beginning that’s how we were going to handle it.”
 

 Appellant contends that this statement, when read in context, refers back to appellant’s 1985 conversation with Schwartz regarding the placement of Sofa Gallery Inc.’s
 
 accounts receivable
 
 in the trust account. The wording of Breindel’s testimony supports this argument. Breindel stated:
 

 “At that point I overheard Mr. Zimmerman say that
 
 as to the accounts receivable,
 
 he said that we — the quote is something to the effect that, ‘We had agreed from the beginning that’s how we were going to handle it.’ ”
 

 (Emphasis added.) We agree with appellant that the statement did not refer to the use of the trust account to
 
 hide
 
 Sofa Gallery Inc. monies from the creditors.
 

 Moreover, Zimmerman’s understanding of this statement is consistent with his earlier testimony regarding his 1985 conversation with Schwartz in the hallway. Zimmerman testified that in 1985 he told Schwartz that he thought the accounts receivable money could be legally held in the law firm trust account; but, because he was not sure, he asked Schwartz to research the question. Nowhere in the testimony is there direct evidence linking Zimmerman to the misuse of the trust fund to hide assets.
 

 Even if the legal basis of Zimmerman’s belief that accounts receivable money could be placed in the law firm’s trust account was incorrect, a fact disputed by the parties but not relevant to the resolution of
 
 *1210
 
 this case, what is relevant is that the testimony established that Zimmerman believed his position was correct. This is not a credibility matter, and we do not agree with the district court that a reasonable jury could infer from this accounts receivable testimony that appellant knowingly conspired to violate the law.
 

 Because the direct evidence used to convict appellant is insufficient to support a finding that appellant knew the trust fund was being used illegally, appellant’s conviction rests on the myriad of circumstantial events and inferences advanced by the government to connect him to the conspiracy. At the outset it is important to note that most of the government’s evidence against appellant basically focuses on appellant’s position as the senior attorney in the law firm. The government argues in its brief that appellant’s knowledge of the conspiracy can be inferred from his role as senior partner, the fact he conducted regular firm meetings to discuss cases and finances, and that he reviewed bills sent out to clients.
 

 We agree with Zimmerman that his position as the senior lawyer in the firm, standing by itself, cannot support a conspiracy conviction. Even if a reasonable jury could infer from the evidence that appellant’s position in the firm gave him knowledge that a conspiracy was underway, knowledge of the conspiracy cannot be equated with participation.
 
 See Fox,
 
 902 F.2d at 1514 (“Mere association with conspirators, even with knowledge of their involvement in crime, is insufficient to prove participation in their conspiracy.”). The accounting for the firm was handled by an employee.
 

 Nonetheless, even absent direct evidence and the evidence regarding appellant’s role as senior partner, sufficient circumstantial evidence was introduced for a reasonable jury to convict Zimmerman. The strongest evidence against appellant in the following paragraphs arose from the following events with the inferences therefrom.
 

 First, it is undisputed that appellant had a billing entry charging the Levines 0.5 hours for “conference with client” on December 13,1985. Although appellant could not remember the nature of this meeting, the timing of the meeting is important. The alleged meeting occurred near the end of the liquidation sale and while Sofa Gallery, Inc. monies were being illegally placed in the law firm account. That same day, two law firm checks were written from the trust account to Marcee Levine in amounts of $18,000 and $7,614.91. While the checks were signed by the business manager, not appellant, the jury could possibly infer that the checks were written as a result of the meeting between appellant and the Levines.
 

 Second, a jury could infer from appellant’s firing of his business manager Arthur Kaplan in February 1986 that appellant may have known of a misuse of the trust account. The firing occurred around the time of the February 19 meeting at the Marriott hotel and during the time the Sofa Gallery, Inc.’s creditors began asking questions about the firm’s trust account. Appellant correctly states that the only testimony in the record regarding this incident, from Zimmerman himself, was that Kaplan did not tell Zimmerman about the trust account. The timing of the firing is the only factor but it could be significant.
 

 Finally, the timing of a check signed by Zimmerman to Cherry Creek Bank, a Sofa Gallery, Inc. creditor, is of importance. On February 19, 1986, Zimmerman issued a $2,692.38 check to Cherry Creek Bank. Although appellant testified that the check was issued in response to a demand by Cherry Creek Bank and had nothing to do with the Marriott meeting held on that same day where the illegal use of the Le-vines’ money was discussed, a reasonable jury could infer from the timing of the two events that they were somehow connected.
 

 While we agree with the appellant that such inferences standing by themselves would not prove a conspiracy, we cannot say that a reasonable jury considering the timing of these events taken as a whole in the light most favorable to the government would acquit. We reiterate, however, that
 
 *1211
 
 the threshold of sufficient evidence is barely met in this case.
 

 Bankruptcy Judges’ Opinions
 

 During the government’s case in chief, the trial court allowed the government to introduce the statements of two bankruptcy judges made in the earlier separate proceedings involving the Levines’ bankruptcy. Both statements contained comments by the judges regarding the law firm’s possible involvement in a conspiracy. Appellant challenges their admission on the basis that they constituted hearsay and were so prejudicial as to constitute reversible error.
 

 The decision to admit or exclude evidence is, of course, within the sound discretion of the district court. On appeal, we review for an abuse of discretion.
 
 United States v. Rodriguez-Pando,
 
 841 F.2d 1014, 1018 (10th Cir.1988). We are mindful that the deference to the trial court is heightened when reviewing the trial court’s rulings on hearsay objections.
 
 Boren v. Sable,
 
 887 F.2d 1032, 1033 (10th Cir.1989).
 

 The first statement at issue was made by federal bankruptcy judge Charles Mathe-son during the October 5, 1987 discovery hearing in Marcee Levine’s bankruptcy proceedings. Judge Matheson stated:
 

 “Mr. Brown is unable to tell us why there was no original account done. The original bookkeeper is not produced. No conversations were apparently held with the original bookkeeper to attempt to explain what has happened to the accounting records. The alternatives that present themselves to that are unsettling on either side; either it is indicative of a casual disregard by the firm of its ethical obligations to carefully account, segregate and maintain accounts for clients’ trust funds,
 
 or it is an indication that the law firm was openly conspiring with the debtor to secret funds and records from the creditors and to properly account to the creditors of this estate for those funds. Either is a serious charge.
 

 [[Image here]]
 

 "... There is not evidence at this point of a willful conspiracy by the firm and the debtor to secret that information, although their record tracks very close to that.”
 

 In re Marcee D. Levine,
 
 No. 87-B-1302 at 91 (D.Bankr.Colo. Oct. 13, 1987) (Order on Motion to Produce) (emphasis added).
 

 The district court admitted Judge Mathe-son’s statement to show appellant’s “knowledge and intent” under Fed.R.Evid. 404(b). The government was permitted to introduce the transcript containing these remarks and read the remarks to the jury. The trial court issued a limiting instruction advising the jury that the evidence should be considered “only for the purpose of showing knowledge and intent.”
 

 The second statement was made in a letter written on April 1,1988 to the United States Attorney’s office by bankruptcy judge Roland Brumbaugh which read:
 

 “In accordance with 18 U.S.C. § 3057, I hereby refer for your inquiry the above-referenced bankruptcy cases for possible prosecution of the two debtors, Gary and Marcee Levine, under 18 U.S.C. § 152, and possible prosecution of their attorneys as co-conspirators.”
 

 The letter was admitted to rebut the testimony of Fred M. Winner, former Chief Judge of the United States District Court for the District of Colorado, who testified that Judge Matheson’s remarks were not judicial findings of fact and were “ill advised.” Appellant’s objections under Fed. R.Evid. 402 and Fed.R.Evid. 403 were overruled. No limiting instruction was given.
 

 The unusual aspect of both these statements is that they are conclusions as to
 
 the crime
 
 for which Zimmerman was then being tried. Although the statements do not mention appellant by name, the statements were in effect an opinion that appellant’s law firm was guilty of the wrongdoing for which appellant was being tried. Because neither statement refers to a prior act involving a different matter, the trial court’s evidentiary ruling does not fit into the Federal Rules of Evidence.
 

 
 *1212
 
 Generally such bad acts or character evidence made at a bankruptcy hearing is not admissible pursuant to Fed.R.Evid. 404(a). An exception exists under Fed. R.Evid. 404(b) for “[ejvidence of other crimes, wrongs or acts ... [used to show] proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident” when one of these is at issue in the case. Fed.R.Evid. 404(b). Although the trial court’s ruling stated that the evidence was admissible under 404(b) to show notice, the appellant’s notice of the wrongdoing by the law firm was not at issue. Appellant acknowledged from the outset of the case that he was present at the October 5 discovery hearing and thus had notice, as did everyone else, that the law firm may have engaged in some illegal activity. Under these circumstances the statement was improperly admitted because it was not a material issue in the case.
 
 See United States v. Rivera,
 
 837 F.2d 906, 912 (10th Cir.1988).
 

 In addition, if the statements were “bad acts evidence” under 404(b), both the government and the court made an insufficient showing of specific purpose for which the evidence was being offered as required in
 
 Rivera
 
 and
 
 Kendall.
 
 Under
 
 Rivera
 
 and
 
 Kendall,
 

 “[t]he
 
 Government must articulate precisely
 
 the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts. In addition,
 
 the trial court must specifically identify
 
 the purpose for which such evidence is offered and a
 
 broad statement merely invoking or restating Rule 404(b) will not suffice.”
 

 Rivera,
 
 837 F.2d at 912 (quoting
 
 Kendall,
 
 766 F.2d at 1436-37.) (emphasis in Rivera). The only reason for admitting the evidence put forth by the government and stated by the court was to show “knowledge and intent.” This was clearly insufficient.
 

 Because the trial court failed to adequately articulate the reasons for the admission of the evidence, the court fell into the trap the
 
 Rivera
 
 and
 
 Kendall
 
 opinions sought to protect against. Without a specifically identified purpose for the admission of the evidence, the court lacked the basis to make an informed decision weighing the probative value of the evidence against its prejudice under Fed.R.Evid. 403. This was particularly important in appellant’s case because of the highly prejudicial nature of admitting another judge’s opinion regarding the asserted conspiracy in the conspiracy case being tried.
 

 In
 
 Johnson v. Colt Industries Operating Corp.,
 
 797 F.2d 1530 (10th Cir.1986), we analyzed the admission of a judicial opinion from a different case to show that a manufacturer had notice of a defect in a products liability case. Although the judicial opinion in
 
 Johnson
 
 was admitted as substantive evidence, the inherent dangers outlined are applicable to the present case.
 

 “The most significant possible problem posed by the admission of a judicial opinion is that the jury might be confused as to the proper weight to give such evidence. It is possible that a jury might be confused into believing that the opinion’s findings are somehow binding in the case at bar. Put most extremely, the jury might assume that the opinion is entitled to as much weight as the trial court’s instructions since both emanate from courts.”
 

 Johnson,
 
 797 F.2d at 1534. These dangers are heightened in the present case because both judicial opinions admitted do not involve a different set of facts. Although the statements here purportedly were not admitted for their substantive purpose, we cannot believe the jury would not place great weight on the fact that both Judge Matheson and Judge Brumbaugh stated in substance that the appellant’s law firm was involved in a conspiracy.
 

 Under these circumstances, we find that the trial court abused its discretion. In addition, because the judges’ statements went to the ultimate issue in the trial, the damage to appellant was not harmless. This is particularly true in light of the lack of direct evidence implicating him in the conspiracy. The admission of the two judges’ statements constitutes reversible error.
 

 
 *1213
 

 Questions Presented to the Court by the Jury
 

 On the third day of deliberations, the jury sent a note to the trial court containing three questions. The questions were direct, well written and clearly described the jury’s problem. The jury asked:
 

 “Question: If a person observes an act that is obviously, to him or her, a crime, (1) does the observer have a legal responsibility to report the crime; (2) does the observer have a legal responsibility to intervene to stop it; (3) does failure to report or otherwise intervene make the observer a participant or in any way responsible?”
 

 A conference was held to determine what the trial court’s response should be.
 

 After some discussion, the trial court indicated that the jury’s questions went to the “heart of the conspiracy concept” and that the jury instructions as a whole adequately addressed the questions posed. Appellant stated that in the absence of his tendered instruction on mere knowledge and association, rejected by the trial court, the court should refer the jury to instruction No. 5 with respect to defining the act of conspiracy and intent, and instruction No. 6 with respect to specific intent. The court rejected such a specific instruction stating that by referring to the instructions as a whole the jury would necessarily be referred to instructions 5 and 6.
 

 Appellant argues on appeal that the court should have given the jury an additional instruction to specifically answer the jury’s question regarding appellant’s duty to report a crime. Appellant, however, did not raise this issue at the hearing and did not propose such an instruction to the court. Our review is for plain error.
 
 See United States v. Kline,
 
 922 F.2d 610, 613 (10th Cir.1990).
 

 When addressing a challenge to jury instructions, “ ‘we review the record as a whole to determine whether the instructions “state the law which governs and provides the jury with an ample understanding of the issues and standards applicable.”'"
 
 United States v. Cardall,
 
 885 F.2d 656, 673 (10th Cir.1989) (quoting
 
 Big Horn Coal Co. v. Commonwealth Edison Co.,
 
 852 F.2d 1259, 1271 (10th Cir.1988) (quoting
 
 Ramsey v. Culpepper,
 
 738 F.2d 1092, 1098 (10th Cir.1984)). We must consider not whether the charge was faultless but whether the jury had an understanding of the issues and its duty to determine these issues.
 
 Id.
 
 at 673.
 

 Ordinarily, the submission of additional instructions once the jury has retired is within the sound discretion of the trial court.
 
 United States v. Walker,
 
 557 F.2d 741, 746 (10th Cir.1977). “When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy.”
 
 Bollenbach v. United States,
 
 326 U.S. 607, 612-13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).
 

 In our view, the questions asked by the jury after three days of deliberation demonstrate that the jury needed help applying the instructions to the evidence. As discussed earlier, much of the government’s evidence centered on appellant’s position in the law firm and his inferred knowledge of the conspiracy. The government even highlighted this theory in closing argument. It is apparent from the record that the government sought to equate the appellant’s position with knowledge of the conspiracy. Given such evidence, it is easy to see why the jury was confused.
 

 The initial instructions to the jury did not provide answers for the questions posed or resolve the confusion generated. In initial instruction No. 6 sent to the jury, the court stated that “the government must prove that a defendant knowingly did an act which the law forbids or knowingly failed to do an act which the law requires, purposely intending to violate the law.” The “failed to do an act which the law requires” language was not explained or defined in the instructions and it would appear that the jury may well have been directing its questions to this portion of instruction No. 6. Based upon the inferential nature of the government’s evidence, the jury wanted to know the consequence of failing to intervene and whether the failure to report a
 
 *1214
 
 crime had significant consequences and could show some guilt or participation.
 

 It is well established that a person who sees a crime being committed has no legal duty to either stop it or report it. The government is incorrect in stating that such a general duty exists under Colorado law, C.R.S. § 18-8-115, or federal law, 18 U.S.C. § 4. Moreover, as the government seeks to do, a lawyer’s ethical duty of good faith under the Code of Ethics, the Uniform Commercial Code or the Restatement (Second) of Contracts cannot be bootstrapped into a legal duty to act. Thus, without a duty there can be no conviction of the observer who does not actively participate in the crime by some conduct.
 
 King v. United States,
 
 402 F.2d 289, 291 (10th Cir.1968);
 
 Bratton v. United States,
 
 73 F.2d 795, 797-98 (10th Cir.1934). The government argues in substance that the jury could rely on the evidence without instruction on the legal consequences of the facts.
 

 The jury should have been instructed in a way that there was no possibility that the conviction was based on an incorrect legal basis. The questions from the jury certainly pointed up the problem.
 
 See Bollenbach,
 
 326 U.S. at 612-13, 66 S.Ct. at 405-06. Absent such an instruction, “[t]he conclusion is inescapable that the jury may have convicted on an improper basis.”
 
 Kline,
 
 922 F.2d at 613;
 
 see also United States v. Munz,
 
 504 F.2d 1203, 1208 (10th Cir.1974);
 
 Michaud v. United States,
 
 350 F.2d 131, 133 (10th Cir.1965).
 

 The government urges that the jury “heard ample evidence about the law” to which it could relate the part of original instruction No. 6, “knowingly failed to do an act which the law requires.” This “evidence about the law” is referred to in the government’s brief in part as follows (referring to No. 6):
 

 “This was not only a proper statement of the law, to which the defendant did not object, but the jury heard ample evidence about the law to which they could relate that instruction during their deliberations. For example, the defense called an expert attorney witness to testify about his review of the bankruptcy files in the case. He admitted on cross-examination that the Uniform Commercial Code imposes an ‘obligation of good faith’ in the performance of contracts of other commercial duties. Supp. Vol. XXXI, p. 36. He also testified that Section 205 of the
 
 Restatement Second of Contracts
 
 ‘imposes upon each party to a contract the duty of good faith and fair dealing in its performance and enforcement.’
 
 Id.
 
 at 37. The jury certainly could relate this to the testimony about Defendant Zimmerman’s actions and conclude that he had failed to do acts which the law requires.”
 

 It is difficult to see how the “good faith” in the Restatement substitutes for an instruction from the court. There was confusion to say the least and it was plain error not to resolve it or attempt to do so.
 

 The remaining issue raised by appellant involves sentencing. We have studied the arguments made, but conclude that we need not comment on them in view of our disposition of the case.
 

 IT IS ORDERED that the judgment is REVERSED by reason of the prejudicial errors and the case is REMANDED for a new trial.