UNITED STATES of America,
Plaintiff–Appellee,

v.

John H. MIGLIACCIO, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Bert M. AVERY, Defendant–Appellant.

Nos. 93–6211, 93–6212.

United States Court of Appeals,
Tenth Circuit.

Sept. 7, 1994.

Mack K. Martin, Martin Law Office, Oklahoma City, OK, for defendant-appellant John Migliaccio.

Robert L. Wyatt, IV (Stephen Jones, with him on the brief), Jones & Wyatt, Enid, OK, for defendant-appellant Bert Avery.

Ross N. Lillard, III, Asst. U.S. Atty. (Vicki Miles–LaGrange, U.S. Atty., with him on the brief), Oklahoma City, OK, for plaintiff-appellee.

Before KELLY and McKAY, Circuit Judges, and BRIMMER, District Judge.[†]

PAUL KELLY, JR., Circuit Judge.

Defendants-appellants Bert M. Avery, M.D., and John G. Migliaccio, M.D., appeal their convictions for conspiracy to defraud the United States, 18 U.S.C. § 371, and mail fraud, 18 U.S.C. §§ 1341 & 2.[1] The government alleged that Drs. Avery and Migliaccio filed false claims with the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) by misrepresenting what surgical procedures were performed. Our jurisdiction arises under 28 U.S.C. § 1291. We reverse the conspiracy convictions and eight counts contained in the mail fraud convictions. We reverse and remand for new trial one count of mail fraud against Dr. Migliaccio, due to inadequate jury instructions.

*Background*

Drs. Avery and Migliaccio are obstetricians/gynecologists who practiced together as Southwest Fertility Center, Inc., and A & M Surgical, Inc., in Lawton, Oklahoma. They were indicted on conspiracy and mail fraud charges after they submitted claims to CHAMPUS for surgeries that included fallopian tube repair. The government charged that the surgeries were reversals of tubal ligations, an uncovered procedure under CHAMPUS regulations, and that Defendants misrepresented the surgeries to CHAMPUS in order to receive payment. It argued that Defendants concealed the true nature of the surgeries by failing to document adequately the patients' previous tubal ligation on the operative reports, failing to submit excised hardware for a pathology determination in some cases, and labeling the fallopian tube repair as "salpingoplasty" rather than "tubal reanastomosis." Defendants assert that the

---

[†] The Honorable Clarence A. Brimmer, Jr., United States District Judge for the District of Wyoming, sitting by designation.

1. Defendants adopt by reference their briefs and arguments on appeal, with the exception of the issue concerning attorney conflict of interest. We consolidate their appeals for purposes of this opinion. Fed.R.App.P. 28(i).

surgeries were medically necessary and deny that they intended to defraud CHAMPUS. They argue that they complied with all hospital and CHAMPUS regulations, and that "salpingoplasty" accurately describes the procedures performed.

Defendants raise several issues on appeal. Together, they argue: first, that there was insufficient evidence of conspiracy and mail fraud; second, that they were entitled to a jury instruction concerning ambiguity and their good faith defense; and third, that the jury instruction error spilled over to the conspiracy charge. Dr. Migliaccio further challenges his convictions because of an alleged conflict of interest in his attorney representation.

## I. Sufficiency of the Evidence

Appellants challenge the sufficiency of the evidence that they used the mails to defraud the government, either individually or together as a conspiracy. We review the evidence in the light most favorable to the government to determine whether substantial evidence exists, direct and circumstantial, together with reasonable inferences therefrom, whereby a reasonable jury might find the defendants guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Zimmerman,* 943 F.2d 1204, 1208–09 (10th Cir.1991). We will not uphold a conspiracy conviction obtained, however, by nothing more than "piling inference upon inference." *United States v. Fox,* 902 F.2d 1508, 1513 (10th Cir.1990) (citations omitted).

Under 18 U.S.C. § 371, a conviction for conspiracy requires that the government prove beyond a reasonable doubt that the defendants agreed to defraud the United States and that one of the conspirators committed an overt act in furtherance of the conspiracy. *United States v. Guadalupe,* 979 F.2d 790, 793 (10th Cir.1992). An agreement between the defendants to violate the law is an essential element, which must be shown beyond a reasonable doubt. *United States v. Davis,* 965 F.2d 804, 814 (10th Cir.1992) (holding various actions of state insurance commissioner insufficient evidence of agree-

ment to bribe a public official). *See also United States v. Butler,* 494 F.2d 1246, 1249 (10th Cir.1974) (mere knowledge of or acquiescence in the object of a conspiracy does not make one a coconspirator). In *United States v. Nall,* 949 F.2d 301, 305–06 (10th Cir.1991), we concluded that the government's proof that the defendants, a buyer and seller of real estate, left a meeting together to make a deposit at a bank was insufficient to prove a conspiracy existed to circumvent the cash transaction reporting requirements of 31 U.S.C. §§ 5324(a)(3) and 5313(a). In *Zimmerman,* 943 F.2d at 1210–11, we concluded that, although a close case, the government's proof of an agreement between an attorney and his partner and his partner's client was sufficient to warrant the jury's guilty verdict. We noted there, however, that the attorneys' partnership and consultation on the client's case was insufficient evidence of a conspiracy. *Id.* at 1210.

While not specifically addressing whether the evidence of an agreement was sufficient to submit the issue to the jury, the government argues generally that the evidence was sufficient to support the conspiracy convictions. We have carefully reviewed the record and conclude that here the government failed to prove the existence of an agreement between the doctors to defraud the United States.

The government offered no direct evidence of an agreement, relying instead on circumstantial evidence and suggested inferences. Its proof, however, that Defendants practiced medicine together, shared one billing system, assisted each other in surgery, and advertised heavily in the Lawton, Oklahoma area simply does not constitute facts upon which a reasonable juror could infer an agreement to commit mail fraud. *See Zimmerman,* 943 F.2d at 1210 (legitimate business partnership, standing alone, does not constitute proof of conspiracy). Neither does the testimony of operating room nurses who testified generally that they heard Defendants discuss insurance filing procedures so that payment might be had. The record simply does not reflect that this testimony constituted evidence of an agreement to engage in criminal conduct. Finally, an expert witness' testimo-

ny that, in his opinion, Defendants were performing operations together and then billing for them in a fraudulent manner, again, is not sufficient evidence of an agreement. At most, a reasonable juror might infer that one defendant had knowledge of the other's intent, but knowledge, by itself, is insufficient to create a conspiracy. *Id.* (citing *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.1990)). We conclude, therefore, that the government failed to meet its burden of proof of an essential element of the crime of conspiracy.

■ The mail fraud statute contains two separate offenses, fraud and misrepresentation. 18 U.S.C. § 1341; *United States v. Cronic*, 900 F.2d 1511, 1513 (10th Cir.1990) (citations omitted); *accord United States v. Falcone*, 934 F.2d 1528, 1539 n. 28 (11th Cir.1991). The indictment here charges that the Defendants willfully and knowingly devised a scheme to obtain money by false representations. False or fraudulent pretenses, representations or promises are therefore an essential element that the government must prove. *Cronic*, 900 F.2d at 1514. The government argues generally that the evidence sufficiently proved that defendants committed mail fraud by making misleading statements on CHAMPUS claims.

Under CHAMPUS regulations, the Defendants must report each procedure performed, whether covered or not, either in narrative form or by use of a procedure code. 32 C.F.R. § 199.7(b)(2)(ix). In turn, CHAMPUS must review each submitted claim for, *inter alia,* compliance, exclusions, utilization of claimed services and quality assurance. 32 C.F.R. § 199.7(g). While CHAMPUS does not provide payments for reversals of sterilization, 32 C.F.R. § 199.4(e)(3)(i)(B)(4), the regulations provide an evaluation system for multiple surgery claims, i.e., surgical claims involving more than one procedure. 32 C.F.R. § 199.4(c)(3)(i). CHAMPUS provides payment at one-hundred percent for the major surgical procedure, i.e., the procedure with the greatest covered cost, and lower payments for other procedures performed at the same time. *Id.* CHAMPUS does not provide payment for any incidental

procedures performed during a multiple surgery. *Id.*

■ The mail fraud counts may be separated into two categories: one group of counts evidenced primarily by documents, and another group of counts evidenced by testimony in addition to documents. The Defendants' convictions of mail fraud from the first group lack sufficient evidence of criminal wrongdoing. The small amount of testimony in the record specifically relating to Counts 2, 6, 8, 9, 10, and 11 does not support a reasonable inference that these claims constitute misrepresentations. In addition an expert witness testified that, in his opinion, Defendants' primary purpose in performing surgery on the patients whose files he reviewed was reversal of sterilization, although he also testified that many of these patients had disease. He, however, did not identify any patients who had no disease. Because Defendants were permitted, and indeed required, to file multiple surgery claims with CHAMPUS that included tubal reversal procedures which CHAMPUS would then review, we cannot say that these statements contained within the claims filed by Defendants were false. Without evidence that statements on these claims were false, no reasonable juror could have concluded that wrongdoing occurred beyond a reasonable doubt.

■ The record on the remaining mail fraud counts contains testimony by two patients as well as documentary evidence. Patient testimony concerning Counts 4 and 5, involving a single patient, and Count 7, shows that these patients had substantial symptoms of disease in addition to a desire to restore fertility. Both patients testified that they went to the doctor for serious pain as well as for fertility reasons. One patient had visited the emergency room several times during menstruation; the other patient had another physician recommend she have a hysterectomy. Both patients testified that their tubal ligations were documented in their patient files, and that Defendants told them that CHAMPUS would not cover the tubal reversals unless the procedure was medically necessary, and perhaps not even then.

■ This evidence is insufficient to show that Defendants made false statements to CHAMPUS concerning these two patients. It shows, rather, that the patients sought treatment for legitimate pelvic problems, regardless of the medical merits of reversals, that the tubal ligations were documented, and that the doctors had honest discussions with them concerning CHAMPUS coverage. CHAMPUS has the duty to evaluate claims and determine amounts of coverage and exclusions; its failure to perform these duties adequately does not convert an otherwise valid claim into a false representation. In fact, for one patient, CHAMPUS denied a significant portion of the claim without explanation, and the physicians requested a review. Without evidence beyond a reasonable doubt that the physicians made false statements on these claims, the convictions must be reversed. *Cf. Cronic,* 900 F.2d at 1516 (overdraft banking is a banking industry practice and does not constitute false statements for purposes of mail fraud conviction).

■ Regarding the mail fraud alleged in Count 3, the patient testified that she went to the Defendants solely for a reversal of sterilization and never experienced nor complained of pelvic pain, although she later testified that she had recurring bladder disease and that the Defendants discovered extensive scarring during her surgeries. Although it was adamantly denied, she also testified that Dr. Migliaccio told her to lie to the hospital staff about the nature of her surgeries; how Dr. Migliaccio could keep secret the nature of procedures to which other hospital staff were necessarily witnesses remains a mystery. Finally, she gave conflicting testimony concerning her discussion with Dr. Migliaccio as to whether CHAMPUS would pay for the procedure; first, she testified that they did not discuss it, but then changed her mind and testified that Dr. Migliaccio told her "not to say anything" because CHAMPUS would not pay if she did. Under our standard of review on appeal, we do not make credibility judgments. Evaluating the evidence in the light most favorable to the government, a reasonable jury could conclude that Dr. Migliaccio made false statements to CHAMPUS concerning this patient's claim. Because no evidence was offered to show that Dr. Avery participated in the alleged mail fraud, however, we reverse his conviction on this count.

## II.   Jury Instructions

■ Dr. Migliaccio's remaining mail fraud count causes us to address his argument that the jury was improperly instructed concerning intent to obtain money by false pretenses and the ambiguity of medical terms and CHAMPUS regulations. The government accused Defendant of using incorrect medical terminology in order to mislead CHAMPUS. The Defendant's theory was that the relevant medical terms and CHAMPUS reporting requirements are ambiguous, that his interpretations were reasonable, and that his reasonable compliance therefore negates an intent to deceive. We review jury instructions as a whole and apply a de novo standard of review. *United States v. Joe,* 8 F.3d 1488, 1500 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1236, 127 L.Ed.2d 579 (1994).

■ A defendant is entitled to jury instructions on his theory of defense if it is supported by sufficient evidence. *United States v. Davis,* 953 F.2d 1482, 1492 (10th Cir.1992). The instructions must adequately instruct the jury on the legal principles underlying the defense; it is not enough to present the defense in wholly factual terms.

Here the Defendant requested the following instruction concerning reporting requirements:

"KNOWINGLY"—ADDITIONAL PROOF REQUIRED IF AMBIGUITY EXISTS IN CHAMPUS REPORTING PROCEDURES

The program integrity supervisor for CHAMPUS testified that providers (the defendants) are required to report all procedures performed regardless of whether the procedures are covered by CHAMPUS, however, the program integrity supervisor for CHAMPUS also testified that the CHAMPUS regulations do not provide for coverage of any related treatment if any services provided are non-covered. The CHAMPUS regulations and provider

handbook state that doctors may charge patients for services determined to be non-covered.

You may find that ambiguity exists in these CHAMPUS reporting requirements as to which procedures are to be reported to CHAMPUS. If you find that ambiguity exists, then to prove the defendants knew their statements to CHAMPUS were false, the government must prove beyond a reasonable doubt that there is no reasonable interpretation of the situation that would make the defendant's statements factually correct.

I Aplt.App. at A–134. Concerning medical terminology, the defendants requested the following instruction:

> "KNOWINGLY"—ADDITIONAL PROOF REQUIRED IF AMBIGUITY EXISTS IN MEDICAL TERMINOLOGY
>
> If you find that the definition of salpingoplasty is a medically acceptable term for reversal of sterilization or tubal reanastomosis, then you may find that the medical literature is ambiguous as to which term is proper. If you find that ambiguity exists, you consider CHAMPUS [sic] duty to review claims to determine whether ambiguous terms were covered. If you find that ambiguity exists, then to prove the defendants knew their statements to CHAMPUS were false, the government must prove beyond a reasonable doubt that there is no reasonable interpretation of the situation that would make the defendants' statements factually correct.

Id. at A–135.

The district court refused these instructions and instead gave the three following instructions:

> DEFENDANTS' THEORY OF THE CASE—GOOD FAITH AND INTENT
>
> Defendants deny that they intended to defraud the United States government in submitting claims to CHAMPUS for medical services provided to military dependents. Defendants contend that some services which may not be "covered" or "al-lowable" under the CHAMPUS program were reported on CHAMPUS claim forms because CHAMPUS regulations require physicians to list on the claim forms all services provided; not just those which are covered or allowable. CHAMPUS and its fiscal intermediary, Wisconsin Physician Services, are then required to review the claims and reimburse for those services which are covered or allowable.
>
> Defendants further deny that they intended to defraud the United States government in using the term "salpingoplasty" on claim forms and their documents. Defendants contend that they believed in good faith that the term "salpingoplasty" is an appropriate medical term to describe a reversal of tubal sterilization.
>
> Defendants further contend that errors or omissions may have been made on claim forms, and medical history records, and other documents due to innocent mistakes made by the Defendant doctors, or by nurses or other hospital personnel; or may be due to a patient's failure to accurately report her medical history.

Id. at A–197.

> GOOD FAITH
>
> The good faith of a Defendant is a complete defense to the charge of mail fraud because good faith is simply inconsistent with the intent to obtain money or property by means of false or fraudulent pretenses, representations or promises alleged in the Indictment. A person who acts or causes another person to act, on a belief or an opinion honestly held, is not punishable under the mail fraud statute merely because the belief or opinion turns out to be inaccurate, incorrect or wrong. An honest mistake in judgment or error in management does not rise to the level of intent to defraud....
>
> While the term "good faith" has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an inten-

tion to avoid taking unfair advantage of another....

*Id.* at A-198.

### PROOF OF INTENT

Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer a defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by a defendant, and all other facts and circumstances in evidence which indicate his state of mind.

If you find that an act was done or omitted, the intent with which it was done or omitted is to be determined by you from all the facts and circumstances as shown by the evidence presented in the case....

*Id.* at A-200.

■■■ The government argues that the "good faith" instructions, together with the remaining instructions taken as a whole, adequately instructed the jury on Defendant's defense theory. We have not previously addressed proper jury instructions in a false statement case such as this where the issue of ambiguity is inextricably intertwined with the defendant's intent and good faith. In cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous. *United States v. Anderson,* 579 F.2d 455, 460 (8th Cir.1978), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). *See United States v. Race,* 632 F.2d 1114, 1120 (4th Cir.1980) (adopting *Anderson* to hold that one cannot be guilty of a false statement beyond a reasonable doubt when his statement is a reasonable construction). *See also United*

*States v. Dale,* 991 F.2d 819, 832–33 (D.C.Cir. 1993) (adopting *Anderson* and *Race* ); *United States v. Barsanti,* 943 F.2d 428, 432 (4th Cir.1991) (following *Anderson* and *Race* ); *United States v. Johnson,* 937 F.2d 392, 399 (8th Cir.1991) (same). This reasoning applies equally well to the false statement element of mail fraud. It necessarily follows that, where the evidence supports a defendant's position, the jury must be instructed concerning reasonable interpretations of ambiguous requirements and the government's ensuing burden.

■■■ Here, the jury was inadequately instructed on the legal foundation of Defendant's theory and the government's burden. The "Defendants' Theory of the Case" instruction merely restates the Defendants' contentions without explaining their legal ramifications. The "Good Faith" instruction addresses the situation where a defendant makes an honest mistake. While mistake sounds similar to the Defendants' theory here, it is not the same. Defendants did not plead honest mistake. Rather, they contended that the CHAMPUS universe contains ambiguous matter, and that their interpretation was reasonable. Because evidence at trial supported their theory of defense, the jury should have been instructed as to its legal basis. Therefore, Dr. Migliaccio's Count 3 conviction is reversed and remanded for new trial.

### III. Conflict of Interest

Attorney Stephen Jones represented Drs. Migliaccio and Avery. At the outset, Mr. Jones advised the Defendants by letter of the risks of joint representation.[2] The Defendants waived this potential for a conflict of interest by signing an Agreement to Joint Representation. The magistrate judge also questioned them in detail at their initial appearance, specifically addressing immunity-

---

2. The letter reads as follows:
   I have also weighed carefully as to whether there is any conflict of interest in my representing the two of you. At the present time, and based upon the materials that you have submitted to me, I cannot imagine any conflict of interest that is reasonable enough to foresee. Since both of you filed the claims and both of you worked on many of the cases under ques-

tion, and you adopted essentially the same techniques, then the only conceivable conflict of interest would be whether the government would want to offer one of you immunity to testify against the other. In my opinion, the chances of that happening are extremely remote.

I R. ex. 14.

for-testimony offers and urging Defendants to retain separate counsel.

On November 20, 1992, the government offered Dr. Migliaccio informal immunity in exchange for truthful information which could be used against Dr. Avery at trial. Mr. Jones discussed the benefits and risks of such an offer with Dr. Migliaccio and suggested terms for continued discussion of the offer with the government. These terms included the proviso that the government would refrain from barring Mr. Jones from representing Dr. Avery as well. I Aplt.App. doc. 2[a] at 2, 4. Dr. Migliaccio declined the offer of immunity.

On the first day of trial, the court held a hearing *sua sponte* on the conflict possibility arising out of the joint representation. The problem was brought to the court's attention through a pretrial motion in limine filed by the government. At the hearing, Mr. Jones questioned the Defendants; Dr. Migliaccio generally responded "yes" or "no." After independent questioning, the trial judge found that the offer of immunity posed an actual conflict of interest but that the Defendants had knowingly, intelligently and voluntarily waived their right to conflict-free representation.

### A. Actual Conflict of Interest

■■■ We review de novo the district court's determination of whether an actual conflict existed; we review the court's findings of fact which underlie such determination for clear error. *United States v. Martin,* 965 F.2d 839, 841 (10th Cir.1992). Because Dr. Migliaccio raised no Sixth Amendment objection at trial, he must show "that an actual conflict of interest adversely affected his lawyer's performance" in order to prevail. *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980). He need not then show actual prejudice "because unconstitutional multiple representation is never harmless error." *United States ex rel. Zembowski v. DeRobertis,* 771 F.2d 1057, 1064 (7th Cir.1985) (citing *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1718–19); *United States v. Winkle,* 722 F.2d 605, 610 (10th Cir.1983). "[D]efense counsel's performance [is] adversely affected by an actual conflict of interest if a specific and seemingly valid or genuine alternative strategy was available to defense counsel, but it was inherently in conflict with his duties to others or to his own personal interests." *United States v. Bowie,* 892 F.2d 1494, 1500 (10th Cir.1990). *See also United States v. Rodriguez Rodriguez,* 929 F.2d 747, 751 (1st Cir.1991) (adverse affect shown where plausible alternative strategy not undertaken due to inherent conflict). The Supreme Court requires no proof of active wrongdoing by conflicted counsel, but cautions that the disadvantage of joint representation is in that which counsel may *"refrain* from doing." *Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978) (emphasis in original).

■■■ Mr. Jones' conflict in this case is patent. He advised his clients that the only conflict which could arise from their joint representation was an immunity-for-testimony offer. Such an offer was made to Dr. Migliaccio. Mr. Jones was therefore in a position to refrain from counseling Dr. Migliaccio to accept the offer of immunity in order to protect Dr. Avery's status or to maintain his own attorney-client relationship with Dr. Avery. Mr. Jones' conditioning further negotiation between the government and Dr. Migliaccio on Mr. Jones' continued representation of Dr. Avery underscores this inherent conflict. As a result, we agree with the district court that an actual conflict of interest existed.

### B. Waiver

■■■ Even assuming an actual conflict, the government argues that Dr. Migliaccio knowingly, intelligently and voluntarily waived his Sixth Amendment right to conflict-free representation. *See Holloway v. Arkansas,* 435 U.S. 475, 483 n. 5, 98 S.Ct. 1173, 1178 n. 5, 55 L.Ed.2d 426 (1978); *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 1468–69, 25 L.Ed.2d 747 (1970). "Because of the potentially grave consequences of their waiver, courts 'indulge every reasonable presumption against the loss of constitutional rights.'" *United States v. Geittmann,* 733 F.2d 1419, 1423 (10th Cir.1984)

(quoting *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970)).

■ Where an actual conflict exists and is brought to the court's attention, the court's participation is integral to a valid waiver. *Wood v. Georgia,* 450 U.S. 261, 272 n. 18, 101 S.Ct. 1097, 1104 n. 18, 67 L.Ed.2d 220 (1981); *Winkle,* 722 F.2d at 612 (requiring new trial). Fed.R.Crim.P. 44(c) requires that

> Whenever two or more defendants have been jointly charged ... and are represented by the same retained or assigned counsel ..., the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

■ The government contends that these requirements were met and the ensuing waiver was valid. In response, Dr. Migliaccio posits that: (1) all waivers tendered prior to manifestation of an actual conflict of interest are immaterial, regardless of their specificity; and (2) a hearing held by the district court after the conflict arises is invalid if conflicted counsel participates in the questioning of the defendant. Our cases, however, are not so broad in scope. Rather, we have held that

> '[i]n order for a defendant effectively to waive his right to conflict-free counsel, the trial judge should affirmatively participate in the waiver decision by eliciting a statement in narrative form from the defendant indicating that he fully understands the nature of the situation and has knowingly and intelligently made the decision to proceed with the challenged counsel.'

*Winkle,* 722 F.2d at 611 (quoting *United States v. Martinez,* 630 F.2d 361, 364 (5th Cir.1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1373, 67 L.Ed.2d 351 (1981)). We deem these steps necessary, even when the court initiates such a hearing. *Id.*

■ At the hearing, Mr. Jones conducted the majority of the questioning and Dr. Migliaccio's answers were brief. However, the district court then asked a series of its own questions that sufficiently established the trial court's "affirmative participation in the waiver decision." *See* Aplee.Supp.App. at 6 (district court explaining pros and cons of government's offer). While the trial court did not elicit narrative responses, Dr. Migliaccio's brief answers did not inhibit the trial court's ability properly to discern a valid waiver here. *See United States v. Rodriguez,* 968 F.2d 130, 139 (2d Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 139, 121 L.Ed.2d 92 (1992); *United States v. Castillo,* 965 F.2d 238, 242 (7th Cir.) ("To insist on [a narrative response] in every case would be to confuse a knowing waiver with an articulate one."), *cert. denied,* — U.S. —, 113 S.Ct. 212, 121 L.Ed.2d 152 (1992).

Moreover, this imperfect hearing, where conflicted counsel, not the trial judge, advised the Defendant of his right to independent counsel, does not stand alone. It must be viewed in conjunction with the extensive questioning done by the magistrate judge at the Defendants' first appearance which demonstrated their awareness of the risks of joint representation and their acceptance of them. Aplt.Br., attach. (D.Ct. Order at 7 n. 6). The district court stressed that the magistrate judge " 'strongly encourage[d]' and 'strongly recommend[ed]' separate representation." *Id.* at 2. Each Defendant thereafter executed a written Waiver of Right to Separate Representation.

Dr. Migliaccio argues that such a waiver, based on specific knowledge of a contingent event, becomes void upon the happening of that contingency. We have found no authority to support this proposition. Instead, we look to the totality of the circumstances here—including each informative discussion of joint representation—to determine whether the Defendant's Sixth Amendment rights have been violated. *See Rodriguez,* 968 F.2d at 139 (deeming "facts and circumstances" more significant than "the exact words used by the trial judge" to a waiver examination). *Cf. United States v. Solomon,* 856 F.2d 1572, 1580–81 (11th Cir.1988) (holding magistrate's pretrial hearing sufficient under Rule 44(c) and considering the district court's cursory

questioning as well), *cert. denied,* 489 U.S. 1070, 109 S.Ct. 1352; 103 L.Ed.2d 820 (1989).

By our taking into consideration the advice by and the waiver given to the magistrate judge, however, we do not suggest that a single waiver of a potential conflict is sufficient. Indeed, "a single waiver pursuant to rule 44(c) may not serve to waive all conflicts of interest that arise throughout the course of that defendant's criminal proceedings." *United States v. Swartz,* 975 F.2d 1042, 1049 (4th Cir.1992). We agree that "[t]he district court has a continuing obligation under rule 44(c) to guard against conflicts of interest that may worsen as circumstances change during the course of representation," *id.,* possibly rendering a prior waiver invalid. *Id.; United States v. Akinseye,* 802 F.2d 740, 745 n. 3 (4th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987).

" '[A] trial court's failure to comply with Rule 44(c) does not, of itself, require reversal of a conviction, and, in order to constitute reversible error, the failure to comply must translate into a denial of the defendant's Sixth Amendment right.' " *United States v. Martin,* 965 F.2d 839, 843 (10th Cir.1992) (quoting *United States v. Burney,* 756 F.2d 787, 791 (10th Cir.1985)). Here, Dr. Migliaccio was warned by the magistrate of the very possibility that occurred. Dr. Migliaccio then confirmed his awareness of his right to seek independent counsel before the trial court and further affirmed his decision to proceed with trial. Dr. Migliaccio's prior waivers coupled with the trial court's hearing after the conflict arose adequately protected his Sixth Amendment rights. *See id.*

Relying on *United States v. Iorizzo,* 786 F.2d 52 (2d Cir.1986), Dr. Migliaccio further argues that the timing of the district court's hearing and the absence of a specific Rule 44(c) motion to prompt it invalidated the ensuing waiver. In the instant case, the district court held "that there was no prejudicial delay in bringing the conflict of interest to the Court's attention," because there was "ample time to conduct a hearing on the record." Aplt.Br., attach. (D.Ct. Order at 4). This finding is not clearly erroneous. While it is preferable that a conflict hearing be held before empaneling the jury, here Dr. Migliac-

cio was given every opportunity to voice his concerns and had sufficient time to request another attorney, had he so desired. *See Iorizzo,* 786 F.2d at 59 (finding "on the spot" decision part of basis for reversal).

We would also observe that when the government is aware of a conflict of interest, it has a duty to bring it to the court's attention and, if warranted, move for disqualification. *United States v. Tatum,* 943 F.2d 370, 379–80 (4th Cir.1991). Before trial, the government moved in limine to prohibit the introduction of evidence relating to the unaccepted offer of immunity to Dr. Migliaccio. It would have been preferable for the government to have specifically alerted the court to the potential conflict sufficiently in advance of trial so that a hearing could have been conducted prior to the actual day of trial. However, we find no reversible error under these particular circumstances since the government's pretrial motion did in fact prompt a hearing.

We have held that "[a]n ineffectiveness-due-to-conflict claim is waived if defendant 'consciously chose to proceed with trial counsel, despite a known conflict to which the defendant could have objected but chose to disregard.' " *Moore v. United States,* 950 F.2d 656, 660 (10th Cir.1991) (quoting *Winkle,* 722 F.2d at 612 n. 12). Our review of the record satisfies us that Dr. Migliaccio made such a choice in this case.

Accordingly, we REVERSE Dr. Avery's convictions in all respects, REVERSE Dr. Migliaccio's convictions in part and REVERSE and REMAND in part for a new trial.