ALBERT LUELLEN v. STATE.

No. A—9377.   July 1, 1938.

(81 P. 2d 323.)

383

L. E. Roseboom, of Enid, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Roy Holbird, Co. Atty., of Enid, for the State.

BAREFOOT, J. The defendant was charged by information in Garfield county with the driving of an automobile while under the influence of intoxicating liquor, was convicted and sentenced to pay a fine of $200, and serve six months in the penitentiary, and has appealed.

The information in this case charged the defendant, Albert Luellen, did "unlawfully, wilfully, knowingly, and feloniously drive and operate a certain motor vehicle * * * over and upon a public highway * * * while under the influence of intoxicating liquor." From the above it will be noted that the only charge made against the defendant was that he operated an automobile upon the public highway while under the influence of intoxicating liquor. It is contended by defendant that the verdict of the jury is contrary to and not supported by the evidence.

In the first place the information in this case charges the defendant with driving a car upon the public highway while under the influence of intoxicating liquor. The charge is brought under section 10324, Okla. Stats. 1931 (Okla. St. Ann., tit. 47, sec. 93), which is as follows:

"It shall be unlawful for any person who is under the influence of intoxicating liquor, or who is a habitual user of narcotic drugs, and the having on or about one's person or in said vehicle of said intoxicating liquor is prima facie evidence of a violation of this act, to operate or drive a motor vehicle on any highway within this state, as defined in section 1, of this act, and any person violating the provisions of this section shall be deemed guilty of a felony and shall be punished by imprisonment in the penitentiary not more than one year, or by fine of not more than two thousand ($2,000) dollars, or by both imprisonment and fine."

In the highway laws of many states, in addition to a provision similar to the above, they have an additional statute defining careless and reckless driving, and making the same a crime, and usually providing as a punishment that of a misdemeanor. The statute of Oklahoma with reference

to driving upon the public highway, Session Laws, 1933, section 14, ch. 113 (Okla. St. Ann., tit. 47, sec. 92), provides:

"Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than nor less than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at a speed greater than will permit him to bring it to a stop within the assured clear distance ahead. Provided, no motor bus or other motor vehicle transporting passengers for hire shall be driven upon any public highway of this state at a rate of speed in excess of 45 miles per hour."

And further provides, that any person guilty of violating said section shall be guilty of a misdemeanor and shall, upon conviction, be fined not less than $10 and not more than $100, or imprisonment in the county jail not less than 10 days, nor more than 30 days, or by both such fine and imprisonment. Under the law these are distinct statutes, and the violation of each constitutes a crime within itself. Here the defendant was charged under the first provision with the crime of driving an automobile upon a public highway while under the influence of intoxicating liquor. He could not be convicted under this charge of a violation of Session Laws, 1933, sec. 14, ch. 113 (Okla. St. Ann., tit. 47, sec. 92), and as stated in 86 A.L.R. p. 1274, Note B., Driving while intoxicated.

"The general rule precluding the punishment as reckless driving of an act made a separate offense for which a punishment is provided has been applied in cases involving statutes making it an offense to drive an automobile while under the influence of intoxicating liquor.

"Thus in People v. McGrath (1928) 94 Cal. App. 520, 271 P. 549, it was held that, where one section of a statute made it unlawful to drive an automobile on a highway while under the influence of intoxicating liquor and another declared that a person who knowingly and willfully drove any vehicle on a highway either without due caution and circumspection or in such manner as to endanger the life, limb,

or property of any person, would be guilty of reckless driving, the defendant could not be convicted of reckless driving under an information charging him merely with driving while under the influence of intoxicating liquor, since the two crimes were distinct in law and fact, and the former was not included in the latter.

"Also, in State v. Andrews (1928) 108 Conn. 209, 142 A. 840, on an appeal from a conviction of reckless driving and driving while under the influence of intoxicating liquor, the court, applying the test whether the same facts required to support the proof of one offense would be sufficient to prove the other, held that the offenses were distinct, and said that facts might establish the offense of driving under the influence of intoxicating liquor and yet show a degree of care for the safety of others.

"And a Maine statute declaring that whoever shall operate a motor vehicle on any way recklessly or while under the influence of intoxicating liquor, so that the lives or safety of the public are in danger shall be punished as prescribed, was held in State v. Derry (1920) 118 Me. 431, 108 A. 568, to denounce two distinct offenses."

The evidence in the case at bar on behalf of the state in chief revealed: That the defendant was driving a Chrysler automobile on U. S. Highway No. 64, east of Enid in Garfield county, on the night of June 22, 1936; that accompanying him were two ladies, one of whom he has since married, and one man by the name of Clint Mitchell. The ladies were in the back seat and the men in the front seat; when at a point about six miles east of the city of Enid they passed a truck going west on said highway in which were Joseph Johnson, driver, and Gene Bachelder, the owner of the truck. They collided with the back end of the truck and just after this collision had a head-on collision with a Buick automobile, which was following the truck in a westerly direction. This car was occupied by Dr. H. O. Warrick and his wife who were in the front seat, and John Carey, Joe Felrath and his boy Bobby were in the back seat. They were returning to their home in Enid after attending a Sunday school party at Covington. It was between 10 and 10:30 p.m. Mr. War-

rick, after stating the above facts, testified that just before the collision he was driving on the north side of the road and about 100 feet behind the truck; that he saw a car coming east which was seemingly going from one side of the road to the other, ahead of the truck. Just at this time he heard the noise of the car striking the truck and he attempted to pull his car to the northwest off of the highway but was struck and knocked unconscious. He did not regain consciousness until the next day and was in the hospital for a period of ten days. There was no testimony on his part as to the defendant being under the influence of intoxicating liquor.

The next witness called by the state was Joseph Johnson, the driver of the truck, who testified to seeing the car coming from the west at a high rate of speed, and that it was swerving nearly in the center of the pavement, and was going from right to left; that he gave him the signal to dim his light, but he did not do so, and that he pulled over to the right as far as he thought he dared to go without getting off the pavement; that the car missed the front end, but hit the back end and he slapped on the brakes, and the brakes set, and he kept the truck upright, but it pulled the brake rod and punched a hole in one of the tires. He heard the noise of the head-on collision of the other cars in an instant, and after stopping his truck, went back to the scene of the collision. He saw the two ladies that were in the Chrysler car, and one of them seemed to be groaning as if dead, and the other one was cursing. She seemed to be drunk. Some one took Mr. Mitchell from under one of the cars. He did not see or speak to the defendant as he did not know him. There was no testimony from him as to the defendant being under the influence of liquor, and he was not doing or saying anything that would indicate that he was.

The next witness called by the state was Gene Bachelder, the owner of the truck. His testimony as to the coming of the Chrysler car and the collision was as stated by the witness Johnson. He was asked:

"Q. Did you smell the odor of liquor around him? A. I smelled it around the car." (The proof showed that Clint Mitchell was under the influence of intoxicating liquor at the time of the collision.) Afterwards, this witness testified: "Q. Did you see the defendant, Albert Luellen, there? A. Yes, sir. Q. Where was he when you first saw him? A. I met him as I started toward the car to see about the man that this lady claimed was dead. Q. Did you have a conversation with him? A. Yes, sir. Q. What was that conversation? A. I asked him if he was in there and he said he was driving the Chrysler car. Q. You got close to him while talking to him did you? A. Yes, sir. Q. Did you observe the odor of liquor on his breath? A. To a certain extent. Q. You say you did? A. Yes, sir. Q. You also smelled liquor in and about the car? A. Yes, sir."

Also on cross-examination he testified:

"Q. Mr. Bachelder, I believe you said you talked to the defendant and he said he was driving the Chrysler car? A. Yes, sir. Q. He seemed to know what he was talking about, didn't he? A. Yes, sir. Q. I don't suppose you have had much experience with drunk men, but from what experience you have had would you say that he was drunk or sober? A. I wouldn't say he was drunk. Q. You wouldn't say he was drunk? A. No, sir. Q. He answered your questions intelligently? A. Yes, sir. Q. And knew what he was doing? A. Yes, sir, seemed to."

On recross-examination he testified:

"Q. Talking about smelling an odor on him, you couldn't tell whether he had been drinking 3.2 beer, or whisky, could you? A. No, sir. Mr. Roberts: No, and no one else could."

The next witness for the state was Ralph Frickenschmidt, and he testified that he was going from Enid to his home east on Highway No. 64, between 10 and 11 o'clock, on June 22nd, 1936. He saw a car in front of him which seemed to stop and then start up; that it went from one side of the road to the other and he was afraid to pass it. He followed the car for over a mile and until the collision occurred. He saw it sideswipe the truck and strike the other car. He got out of his car. His testimony was:

"Q. What did you see then? A. A woman sitting off the pavement there on the grass there on the side of the road. Q. How many women? A. There was two of them. Q. Was there a young woman and an older woman? A. Yes, sir. Q. What were they doing? A. One of them was groaning. Q. Which one? A. The older one. Q. Anything else? A. No, sir, she was sitting near the slab. Q. The young one, what was she doing? A. She was cursing and hollering and everything else. Q. Do you know what her condition was? A. No, sir. Q. Do you know whether she was drunk or sober? A. I don't know."

He testified that he did not see the defendant and knew nothing with reference to whether he was under the influence of intoxicating liquor; that he did not see anyone in the crowd that he thought was drunk.

Raymond Shaffer, the next witness called by the state, testified that he lived at Enid, and attended the Covington Sunday school meeting. He left there just before Dr. Warrick did, and met a car on the highway coming east. This car failed to dim its lights, and he pulled off the slab. The car was going from the south side of the pavement to the north side. He did not know who was in the car, but to the best of his knowledge it was a Chrysler car, a brown or tan car.

Kenneth Murray, called by the state, testified that he was in company with Ray Shaffer, and corroborated his testimony. With this testimony the state closed its case.

There was no demurrer filed to the evidence and no motion for a directed verdict, but defendant immediately began the offering of evidence in his own behalf. From the above statement of the evidence, it will be readily noted that it was insufficient to prove that defendant was "under the influence of intoxicating liquor" at the time of the collision, which as heretofore stated was necessary, under the terms of the allegations of the information filed in this case. No witness, up to this time, had sworn that defendant had drunk any intoxicating liquor of any kind or character. A goodly number of witnesses were present at the time of

the collision. Others came soon after it happened. None testified that the defendant was drunk or under the influence of intoxicating liquor, or that he acted in any manner that would indicate that he was. The only evidence was by the witness Bachelder, who, when asked if he smelled the odor of liquor around him, replied he smelled it around the car, and when further pressed and asked if he observed liquor on his breath, he said, to a certain extent. But he would not testify on cross examination that he was under the influence of intoxicating liquor, and that he did answer his questions intelligently, and acted intelligently and knew what he was doing, and this, coupled with the testimony of the witness Ralph Frickenschmidt that he did not observe any one there whom he thought was drunk. Under this testimony, if a demurrer had been made thereto it would have been the duty of the court to sustain the same. But instead of demurring or moving for a directed verdict, the defendant took the witness stand in his own behalf and testified:

That he lived in Enid and worked most of the time at the Enid Poultry & Egg Company; that he had been tried in this case once before and had a hung jury; that he had never been arrested before; that on the 22d day of June, 1936, he went with Mr. Clark, his former employer, and his son to Blackwell about 2 o'clock in the afternoon; that on the way over there they stopped at Pond Creek and had a bottle of 3.2 beer; that he drank a glass of 3.2 beer while at Blackwell, and also when they started for Enid in the afternoon they stopped in Tonkawa, and had a bottle of beer and arrived back in Enid about 7 o'clock; that he ate a sandwich at a restaurant and went around to the pool hall, and was sitting on the ice box when he met a friend of his named Clint Mitchell, whom he had formerly worked with at the Enid Poultry & Egg Company, and that Mitchell was drunk at that time; that he asked him to have a glass of beer and that he did so. Just at this time a lady came to the pool hall and he went out to talk to her. It was his girl

friend and he has since married her. While talking to her, his friend Clint Mitchell came out and began to look for his car. He could not remember where it was parked. Mr. Clark, who ran the pool hall, asked him to help him find his car, and take him out for a drive and try to get him sobered up. The car was found in a few minutes, and he drove back to where his girl friend was and picked her and a lady friend up. She was an elderly woman named Mrs. Ray, about 50 years of age, and conducted a rooming house where she lived. He drove out to the Peacock Inn and Mr. Mitchell insisted that all of them take a bottle of beer, which they did. That afterwards they drove around, and started out on Highway No. 64, east of Enid, and the collision occurred as testified to by witnesses for the state. Defendant testified that a car with lights was approaching him, and that he got off the pavement, and when he got back he misjudged the car, and his car skidded on the pavement, and struck the back end of the truck, and knocked the front wheel down so that he could not control the car, and that Dr. Warrick's car hit him head-on. He got out of the car, and assisted in getting Mr. Mitchell from under the car, and tried to calm the women who were hollering and excited; that he saw a car approaching and asked him to bring them to town, and that by that time another party came up and said he would haul them in. He put his lady friend and Mrs. Ray and Mr. Mitchell in the back seat and he got in the front seat with the driver, and they were brought to Springs Hospital in Enid; that his wife was hysterical. He carried Mrs. Ray to her home; that he misjudged the distance of the car; that he was not drunk; that he was only driving Mitchell around to get him sober.

Juanita Luellen testified for the defendant that she had married him July 22, 1936; that she was with him on the night of the collision. She corroborated his testimony as to the drinking of beer with him, after she was with him, but that he was not drunk at the time of the accident.

A. L. Clark testified that defendant went with him to Blackwell and they stopped at Pond Creek and got a bottle of beer and one at Blackwell and one at Tonkawa when they returned. He testified to asking the defendant to take Mitchell out for a ride, because he was pretty drunk, and he wanted to get him away from his place of business, and that defendant was sober when he left in the car.

Harold Brown testified that he lived at Marshall; that he was the man who brought the parties to the hospital on June 26, 1936; that defendant rode in the front seat with him; that he did not smell any liquor on his breath that he knew of; that he did not know if he was drunk or sober; that he seemed to talk intelligently; that he was trying to calm his wife who was very much excited; that the odor of liquor was very strong from the man in the back seat and he was drunk. With this testimony the case was closed. No demurrer to the evidence or motion for a directed verdict was asked by counsel for defendant and after the instructions were given by the court the case was submitted to the jury, and a verdict was returned finding the defendant guilty, and assessing his punishment at a fine of two hundred dollars and six months in the penitentiary. The statute under which defendant was prosecuted has been before this court in many cases. Daft v. State, 56 Okla. Cr. 449, 42 P. 2d 146; Little Star v. State, 55 Okla. Cr. 294, 29 P. 2d 995; Curry v. State, 54 Okla. Cr. 225, 17 P. 2d 521; McFadden v. State, 53 Okla. Cr. 287, 10 P. 2d 731; Harragara v. State, 52 Okla. Cr. 41, 3 P. 2d 749; Lee v. State, 49 Okla. Cr. 258, 293 P. 1114; Davis v. State, 48 Okla. Cr. 186, 290 P. 347; Brown v. State, 48 Okla. Cr. 251, 290 P. 416; Ware v. State, 47 Okla. Cr. 434, 288 P. 374; Brown v. State, 47 Okla. Cr. 169, 286 P. 911; Bruce v. State, 46 Okla. Cr. 214, 287 P. 809; Ryan v. State, 46 Okla. Cr. 5, 283 P. 809; Welch v. State, 43 Okla. Cr. 47, 277 P. 280. The latest case is that of Haithcock v. State, 63 Okla. Cr. 276, 74 P. 2d 641, which is more similar to the facts in this case than any of the others. A reading of all these cases will reveal the fact that the proof

of the state in chief was to the fact that the defendant was either "drunk" or "under the influence of intoxicating liquor." This fact was positively sworn to by some witnesses. In the case at bar no witness for the state swore to this fact, but the defendant, when he took the witness stand in his own behalf, testified that on the afternoon prior to the collision he had drunk a bottle or glass of beer on five different occasions and several of them were just prior to the collision. When this fact is taken into consideration, it supports the evidence of the state's witnesses, who testified that the car which defendant was driving was zigzagging from the north to the south side of the pavement just prior to the collision, and of his misjudging the distance when he said he collided with the truck and went head-on into the Buick car driven by Dr. Warrick.

As above stated the Oklahoma statute does not define what is meant by the term "under the influence of intoxicating liquor." This court in several of the cases heretofore cited, beginning with Welch v. State, 43 Okla. Cr. 47, 277 P. 280, has held that this term is of common use, and requires no definition or explanation to be understood by persons of ordinary intelligence, and is not error for the court in cases brought under this statute to fail to define or explain such term. This court, as it is now constituted, is not prepared to say that the above statement is wrong as a matter of law, but we do think it is much better for the court to give an instruction defining this term, so the jury may have some conception and understanding of what the law considers being "under the influence of intoxicating liquor." This is the very gist of the crime. Without it being defined one juror may construe it to mean that a party must be "drunk," another that he be "completely out" and devoid of reason, another may construe it to mean that if it is proven that he has taken one drink that he is therefore "under the influence of intoxicating liquor." For this reason we believe it best for the court to define the term, so that the jury may know what the law considers as one

being under the influence of intoxicating liquor. A definition of this term will in our opinion defeat many mistrials in cases brought under this statute. It is a well known fact that intoxicating liquor has a different effect upon the system of different parties. Some persons may drink a quantity of liquor, and still be in their normal senses, others with a very limited quantity will be completely out. Some people are not so much affected by the drinking of beer, others become completely drunk by the drinking of the same. These are all questions to be determined by the jury, under proper evidence, and proper instructions, to meet the issues of each case, and when the jury has been properly instructed, and the evidence properly admitted, this court as reflected under its many decisions heretofore cited will not set the verdict aside. In the instant case the court instructed the jury defining what was meant by the term "under the influence of intoxicating liquor" in the following instruction:

"Instruction No. 5. You are instructed that when any person, from the use of intoxicating liquors, has affected his reason or his faculties, to any extent, or has rendered himself incoherent of speech, or has caused himself to lose control, in any manner, or to any extent, of the actions or motions of his body, such person, in contemplation of the law, is under the influence of intoxicating liquor."

This instruction was not excepted to by defendant and counsel (who did not represent defendant at the trial) in his brief says: "Under instruction No. 5, given by the court, which counsel believes to be the law and believes that the trial court fairly stated the law under instruction No. 5." He would, therefore, be precluded from questioning the instruction at this time. And while we are not prepared to say the instruction was erroneous, the words "to any extent" and "in any manner" tend to limit the definition within very narrow bounds. In view of the fact that many cases arise in Oklahoma under this statute, and the increased automobile traffic, and danger from drunken driving, we

have searched the books for what we believe to be a fair definition of the words "under the influence of intoxicating liquor." This definition we have found in the case of People v. Dingle, 56 Cal. App. 445, 205 P. 705, which definition has been adopted by Berry on Automobiles, vol. 2 (6th Ed.) sec. 2022, p. 1638, and is as follows (page 706):

"However, with respect to the meaning of the phrase 'under the influence of intoxicating liquor,' as used in this statute, we think we are well within the bounds of accuracy in saying that if intoxicating liquor has so far affected the nervous system, brain or muscles of the driver of an automobile as to impair, to an appreciable degree, his ability to operate his car in the manner that an ordinary prudent and cautious man, in the full possession of his faculties, using reasonable care, would operate or drive a similar vehicle under like conditions, then such driver is 'under the influence of intoxicating liquor' within the meaning of the statute."

See, also, People v. Ekstromer, 71 Cal. App. 239, 235 P. 69.

Evidently it was not the intention of the framers of the motor vehicle act, section 10324, Okla. Stats. 1931 (Okla. St. Ann., tit. 47, sec. 93), to fasten guilt in the case of any and every "influence" due to the use of intoxicating liquor however slight. It was enacted to protect the public from those who, while under the influence of intoxicating liquor, attempt to operate an automobile upon the highways of this state, and especially at a time when there is a world of traffic difficulties. This law should be liberally construed so as to effect its purpose, and bring safety to those who drive the public highways in an orderly and lawful manner. The term "under the influence of intoxicating liquor" is one of fact to be determined by the court or jury after hearing all the facts and circumstances in the case.

In the case at bar the defendant testified that he had five bottles of beer during the afternoon and night prior to the collision. The witnesses offered by him corroborate

**396**

this. The state's witnesses showed that his automobile zigzagged down the highway just prior to the accident, and to such an extent that it was necessary for them to stop their automobiles and attempt to leave the highway in order to avoid a collision. These were all proper facts to be considered by the jury, and it is not for us to say they came to the wrong conclusion. But in view of all the evidence, and after a careful consideration of all the facts, we have come to the conclusion, that justice in this case would best be met by reducing the sentence from a fine of $200 and six months in the penitentiary to a fine of $200. The statute under which defendant was prosecuted does not permit a jail sentence.

The judgment of the district court of Garfield county is, therefore, modified and affirmed.

DAVENPORT, P.J., and DOYLE, J., concur.