**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 16, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DANNY GENE KIRBY,

    Defendant - Appellant.

No. 24-7070

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:23-CR-00026-JFH-1)**
_____

Leah D. Yaffe, Assistant Federal Public Defender (Virginia L. Grady, Federal Public Defender, with her on the briefs), Denver, Colorado, for Defendant-Appellant.

Linda A. Epperley, Assistant United States Attorney (Christopher J. Wilson, United States Attorney, and Joshua Satter, Assistant United States Attorney, on the brief), Muskogee, Oklahoma, for Plaintiff-Appellee.
_____

Before **MATHESON**, **PHILLIPS**, and **ROSSMAN**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

    Sometimes, jury instructions aren't complete. And when a jury needs help bridging the gap, simply telling the jury to reread the instructions gives

none. It might even lead the jury to convict based on a misunderstanding of the law.

This situation arose during Danny Kirby's criminal trial. Kirby wrecked his motorcycle with his girlfriend aboard. She died from her injuries, and the federal government charged Kirby with involuntary manslaughter in Indian Country. To determine guilt, the jury had to decide whether Kirby had been driving "under the combined influence" of alcohol and any other intoxicant. But the jury instruction left the jury guessing about whether Kirby would be "under the . . . influence" solely for having alcohol and any other intoxicant in his body, or whether the intoxicants must have rendered him incapable of safely driving. So the jury asked the court which interpretation was correct.

Oklahoma law defines the "under the influence" element as requiring that a driver be incapable of safely operating a motor vehicle, not that a driver have merely ingested a detectible level of intoxicants. But the district court did not inform the jury of that definition in response to the jury's expressed uncertainty on that very point. Instead, the court advised the jury to revisit the instructions already given. A few minutes after receiving that advice, the jury returned a guilty verdict.

The district court had a duty to supplement its instructions to answer the jury's well-stated question. In not doing so, the court abused its discretion. And from what we see, this error likely led to Kirby's guilty verdict. Everyone agreed that Kirby had alcohol and other intoxicants in his system. If the jury

2

thought that was enough for guilt, it wouldn't have needed to send its question to the court. So sending the note signaled that at least one juror (or maybe even a majority or all of them) doubted whether Kirby was incapable of safely driving his motorcycle that night. The jury's quick verdict after being told to reread the instructions points toward the jury's mistakenly believing that Kirby must be found guilty just for having alcohol and another intoxicant in his system. And that means the court's error in not supplementing the "under the influence" instruction wasn't harmless.

We vacate Kirby's conviction and remand for further proceedings.

## BACKGROUND

### I.    Factual Background

One summer day in 2022, Kirby and his girlfriend, S.B., socialized with friends at Lake Eufaula in Oklahoma. The group rode jet skis and lounged at the beach. Kirby drank at least one beer.

Later, after S.B. suggested a group motorcycle ride, the friends parted to gather their bikes from other locations. They reconvened at a lakeside bar that Kirby had recommended. Kirby drank a couple more beers. Though most of Kirby's friends did not see him with marijuana, one friend said he'd seen Kirby vape one puff of it. All of them agreed that Kirby seemed sober as the group rode off together that evening.

Kirby rode his motorcycle with S.B. on back. He wore a helmet; she did not. The roadway was dry and free of debris. But it was dark, and the road lacked fog lines or a shoulder. Kirby drove at or below the speed limit.

Not far from the bar, Kirby overshot a sharp curve and left the roadway. To return to the road, his motorcycle's front wheel had to scale a four- to six-inch ledge up to the pavement. But the wheel failed to do so, pitching the motorcycle forward and tossing both riders. Kirby landed nearby and was able to regain his feet. But S.B. landed across the roadway and lay unresponsive.

One of their friends called 911. An ambulance arrived about twenty minutes later. The first responding state trooper, who arrived about five minutes after that, remembered Kirby being "nervous," "anxious," and "out of sorts." R. vol. V at 89, 130. He also recalled that Kirby repeatedly wandered around the scene of the accident. Kirby felt rib pain but declined medical treatment.

At the accident scene, Kirby engaged the trooper in small talk, including asking where the trooper was from and whether he knew some of Kirby's acquaintances. Kirby mentioned that he served on the city council and said the trooper should know him. This made the trooper feel "uncomfortable" and as if Kirby "was trying to dominate the situation." *See id.* at 95–96. Another officer saw it as an attempt to distract the trooper from investigating.

From Kirby's "demeanor, bloodshot eyes, [and] odor of alcohol," the trooper asked Kirby to take a field sobriety test. *Id.* at 98. Kirby complied. The

4

trooper tested Kirby for horizontal gaze nystagmus. This required Kirby to follow the trooper's fingertip with his eyes. But Kirby didn't complete the test. After the third attempt, the trooper asked if Kirby wanted to try again, and Kirby declined. Kirby also declined to perform sobriety tests that involved walking or standing on one leg. But he was willing to take a breathalyzer test. The trooper later acknowledged that the nearby emergency-response activity might have affected Kirby's concentration.

The trooper then asked Kirby to submit to a blood draw. Kirby hesitated but agreed. Before Kirby and the trooper left for the hospital for the blood draw, a different officer asked to see Kirby's tribal identification card. The trooper recalled that Kirby fumbled with his wallet and couldn't produce the ID without assistance. But by then, Kirby was in handcuffs for the ride to the hospital. The trooper also described Kirby as "struggling to keep it together," "sweating profusely," "[f]idgety," and "having a hard time sitting still." *Id.* at 107–08. Kirby told the trooper he wanted to go for the blood draw as soon as possible so he could check on S.B.

After observing Kirby during the blood draw, the hospital's charge nurse later described him as "disheveled" and exuding "a strong smell of alcohol." *Id.* at 167. She said Kirby was advised for medical reasons not to leave but that he left anyway to see S.B. at a different facility. S.B. later died from her injuries.

Kirby's blood test revealed various substances, including two opiates, an amphetamine, two antidepressants, and "three drugs indicating marijuana use or

5

cannabis consumption of some kind." *Id.* at 251–52. It also showed a blood alcohol level of 0.028 percent, below Oklahoma's per se limit of 0.08 percent. From the test results, the forensic toxicologist couldn't say with a reasonable degree of certainty whether Kirby was impaired at the time of the accident.

## II.    Procedural History

### A.    Indictment

On February 15, 2023, a grand jury sitting in the Eastern District of Oklahoma indicted Kirby on a single count: involuntary manslaughter in Indian Country. *See generally* 18 U.S.C. §§ 1112, 1151, 1153. The indictment charged Kirby with killing S.B. while committing "an unlawful act not amounting to a felony." *Id.* § 1112(a). The alleged unlawful act was the Oklahoma misdemeanor of driving "under the combined influence of alcohol and any other intoxicating substance which may render such person incapable of safely driving or operating a motor vehicle." Okla. Stat. tit. 47, § 11-902(A)(5), (C)(1).[1]

That June, the case went to trial. The jury heard two days of testimony. On the third day, it began deliberating.

---

[1] Kirby's involuntary-manslaughter count also charged an alternate theory: killing S.B. while committing "a lawful act" "in an unlawful manner" or "without due caution and circumspection." 18 U.S.C. § 1112(a).

**B.      The Jury's Note**

After deliberating for a few hours, the jury sent the court a note. It read:

> When stating under the influence, does this mean that as long as it is in his system it is unlawful or do we need to determine if he was affected by substances to be impaired or unlawful?

R. vol. IV at 10.[2]

The trial judge gathered counsel. The judge said he believed that "the instruction already g[ave] an answer to the question," and so he was "not inclined to answer the question further." R. vol. V at 376. He proposed responding that "[y]ou have all the instructions you need to return a verdict." *Id.*

The government didn't object. But Kirby wasn't so sure. His counsel noted that the instructions tracked the Oklahoma DUI statute by incorporating the statutory language "under the combined influence of alcohol and any other intoxicating substance which may render a person incapable of safely driving a motor vehicle." *Id.* at 377 (quoting R. vol. III at 27).[3] He then suggested

---

[2] This was the jury's second note. The first asked about the difference between negligence and gross negligence, and whether the jury had to find gross negligence for Kirby to be guilty of involuntary manslaughter. After conferring with counsel, the district court responded with a note defining the two terms and explaining that the government had to prove gross negligence. The jury sent its second note about an hour later.

[3] The jury instructions twice recite this part of the Oklahoma DUI statute—once in the instruction for involuntary manslaughter, and once in the instruction listing the elements of the Oklahoma DUI offense.

responding "with that definition of what having chemicals in [one's] blood would have to result in." *Id.*

The trial judge was reluctant to give another instruction. He remarked that "there's two instructions that do tell [the jury] what [it] need[s] to look at" and that "going further into the instruction is me participating too much." *Id.* at 378.

Kirby's counsel emphasized that "for [Kirby] to be guilty of at least one theory of this crime he must be actually impaired and not just have the substances in his body." *Id.* at 378–79. So to clarify that for the jury, Kirby's counsel proposed the following supplemental instruction:

> The government must show [that Kirby was driving] while under the combined influence of alcohol and any other intoxicating substance which may render a person incapable of safely driving a motorcycle.

*Id.* at 379.

The trial judge reread the jury's note and remained "not inclined to try to answer th[e] question." *Id.* He worried about "the danger [of] trying to interpret the instruction that [he'd] already given for them." *Id.* But he gave counsel another minute to "write something out" for him to consider. *Id.* Kirby's counsel then proposed an improved version of his most recent try:

> The United States must show that the combined influence of alcohol and any other intoxicating substance rendered the defendant incapable of safely driving a motor vehicle.

*Id.* at 380.

The trial judge responded that he believed that the proposal's content was already "contained within" the instructions' two references to the Oklahoma DUI statute. *Id.* at 380. And he also raised a separate issue: that the jury's note "introduce[d] a new term that is not in the instruction," namely, the word "impaired." *Id.* The judge was "hesitant to" distinguish between "impaired" and the statutory word "influence." *Id.*

Kirby's counsel reiterated his concern "that somehow [the jury] may have developed the impression that the mere presence of some sort of intoxicant is sufficient to find [Kirby] guilty[,] which is certainly not the law." *Id.* But counsel agreed the original instructions relayed what counsel now proposed, though "[i]n slightly different words." *Id.* at 381.

The court recessed to think things over. After doing so, the trial judge explained that both times the instructions referenced Oklahoma's DUI law, the instructions' language "track[ed] the statute." *Id.* at 382. By contrast, the court opined that Kirby's proposed language deviated from the statute. *Id. Compare id.* at 380 (proposing that "the combined influence of alcohol and any other intoxicating substance [must have] rendered [Kirby] incapable of safely driving"), *with* Okla. Stat. tit. 47, § 11-902(A)(5) (requiring that Kirby must have been "under the combined influence of alcohol and any other intoxicating substance which may render [him] incapable of safely driving").

In the trial judge's view, "whether there's a difference in that meaning or not . . . [was] not for [him] to decide." R. vol. V at 382. So he resolved "not . . .

to change the language of the statute" as it appeared in the instructions. *Id.* He acknowledged Kirby's objection and sent the jury a response reading "[y]ou have all the instructions you need to return a verdict." *Id.* at 382; R. vol. IV at 10.

### C.     Verdict & Appeal

A few minutes after getting the court's response to its question, the jury reached its verdict. The jury found Kirby guilty of involuntary manslaughter on the theory that Kirby had killed S.B. while violating Oklahoma's DUI statute.[4] The court later imposed a low-end sentence of forty-one months' imprisonment and three years' supervised release.

Kirby timely appealed. He contends that the jury note revealed the jury's uncertainty about Oklahoma's DUI law. He relies on the jury's expressed uncertainty about whether he would be "under the influence" merely for driving with intoxicants in his system, or whether the government needed to prove that the intoxicants in his system rendered him incapable of driving safely. He argues that the district court erred by not telling the jury the answer, which may have led the jury to wrongfully convict. So he asks us to vacate and remand for further proceedings.

---

[4] The jury unanimously rejected the government's alternate theory that Kirby had engaged in a lawful act in an unlawful or careless manner.

## JURISDICTION

Kirby appeals the district court's final judgment of conviction. We have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review for abuse of discretion a district court's decision about how to "shap[e] or phras[e]," or whether "to give or refuse," a specific jury instruction. *United States v. Christy*, 916 F.3d 814, 854 (10th Cir. 2019) (citation omitted).[5] That includes any such decision made after the jury retires. *See United States v. Zimmerman*, 943 F.2d 1204, 1213 (10th Cir. 1991). A court abuses its discretion when its decision rests on "an error of law or a clearly erroneous finding of fact," or when the decision "manifests a clear error in judgment." *United States v. Clay*, 148 F.4th 1181, 1190 (10th Cir. 2025) (citation omitted).

We review most jury-instruction errors, like many other errors made by a judge during trial, for harmlessness. *See United States v. Freeman*, 70 F.4th 1265, 1280 & n.14, 1287 (10th Cir. 2023); *Sullivan v. Louisiana*, 508 U.S. 275, 280–81 (1993). For constitutional errors, the government must prove harmlessness beyond a reasonable doubt. *See Neder v. United States*, 527 U.S. 1, 7 (1999); *United States v. Rudolph*, 152 F.4th 1197, 1231 (10th Cir. 2025). For nonconstitutional errors, the government must prove harmlessness by a

---

[5] Kirby argues only that the district court erred by not supplementing the instructions to cure the jury's uncertainty about what "under the influence" meant. He does not challenge the instructions given.

11

preponderance of the evidence. *Fry v. Pliler*, 551 U.S. 112, 116 (2007); *see United States v. McFadden*, 116 F.4th 1069, 1094 & n.8 (10th Cir. 2024). That requires proof by a preponderance that the error neither substantially influenced the trial's outcome nor left "grave doubt[s]" about whether it did. *Rudolph*, 152 F.4th at 1231 (citation omitted).

## DISCUSSION

The district court abused its discretion by directing the jury to revisit the original instructions rather than eliminating the jury's understandable uncertainty about an element of the offense. And because that error may well have led to Kirby's guilty verdict, we can't say it was harmless. So we vacate and remand.

## I.    Abuse of Discretion

When a jury is obviously and reasonably uncertain about a relevant legal rule, a district court must do what it can to cure the uncertainty. Here, it did not. That was an abuse of discretion.

### A.    Controlling Caselaw

#### 1.    *Bollenbach*

The seminal precedent guiding us is *Bollenbach v. United States*, 326 U.S. 607 (1946). Bollenbach and others were indicted for two offenses: (1) transporting securities in interstate commerce knowing them to be stolen and (2) conspiring to commit that offense. *Id.* at 608. Bollenbach was tried separately. *Id.* It was undisputed that the securities were stolen in Minnesota

and transported to New York, where Bollenbach "helped to dispose of them." *Id.*

After deliberating for seven hours, the jury reported to the court that it was "hopelessly deadlocked." *Id.* at 609. Interacting with the court, one juror asked, "Can any act of conspiracy be performed after the crime is committed?" *Id.* The court "made some unresponsive comments but failed to answer the question." *Id.* Soon after, the jury sent a note asking, "If the defendant were aware that bonds which he aided in disposing of were stolen does that knowledge make him guilty on the [conspiracy] count?" *Id.* The court responded unhelpfully that "possession of stolen property in another State than that in which it was stolen shortly after the theft raises a presumption that the possessor was the thief and transported stolen property in interstate commerce." *Id.* Five minutes later, the jury returned a guilty verdict on the conspiracy count. *Id.* at 610.

The Supreme Court framed the question as "whether [Bollenbach] was properly convicted under the indictment." *Id.* at 609. In unusually sharp language, the Court criticized the district court's performance, describing its answer to the jury's question as "palpably erroneous." *Id.* at 611. The Court emphasized that "[i]n a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law." *Id.* at 612 (citation omitted). It further noted that "[p]articularly in a criminal trial, the judge's last word is apt

13

to be the decisive word. If it is a specific ruling on a vital issue and misleading, the error is not cured by a prior unexceptional and unilluminating abstract charge." *Id.* at 612.

The Court saw that "[t]he jury was obviously in doubt as to Bollenbach's participation in the theft of the securities in Minneapolis and their transportation to New York." *Id.* It noted that "[t]he jury's questions, and particularly the last written inquiry[,] . . . clearly indicated that the jurors were confused concerning the relation of knowingly disposing of stolen securities after their interstate journey had ended to the charge of conspiring to transport such securities." *Id.* It observed that the jury's ability to do its duty "depended on discharge of the judge's responsibility to give the jury the required guidance by a lucid statement of the relevant legal criteria." *Id.* And in an oft-quoted passage bearing on Kirby's case, it declared that "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *Id.* at 612–13. So the Court reversed after observing that "[a] conviction ought not to rest on an equivocal direction to the jury on a basic issue." *Id.* at 613.

### 2. *Zimmerman*

We reached a similar result in *United States v. Zimmerman*, 943 F.2d 1204 (10th Cir. 1991). Zimmerman was a lawyer whose firm represented two clients in bankruptcy proceedings. *Id.* at 1206. He was charged with conspiring to use the firm's trust account to conceal the clients' assets from the bankruptcy court and creditors. *Id.*

14

On the third day of deliberations, the jury sent a note to the court asking whether "a person [who] observes an act that is obviously, to him or her, a crime" has a "legal responsibility to report the crime" or "to intervene to stop it," and otherwise becomes "a participant or in any way responsible." *Id.* at 1213. Though the trial judge agreed the jury's question went to the "heart of the conspiracy concept," he concluded that the question was already answered by the instructions given. *Id.* So he redirected the jury to the instructions as a whole and denied Zimmerman's request to redirect the jury to only the instructions defining conspiracy and specific intent. *See id.* The jury later convicted. *Id.* at 1206.

On appeal, Zimmerman argued that the district court should have given an additional instruction specifically answering the jury's question about a duty to report or stop a crime. *Id.* at 1213. We reviewed for plain error because counsel had not objected on that ground at trial. *Id.*

We began by noting that "[o]rdinarily, the submission of additional instructions once the jury has retired is within the sound discretion of the trial court." *Id.* But this general rule had to bow to *Bollenbach*'s command that "[w]hen a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." *See id.* (quoting *Bollenbach*, 326 U.S. at 612–13).

In applying *Bollenbach*, we determined that the jury's questions and its lengthy deliberation "demonstrate[d] that the jury needed help applying the

15

instructions to the evidence." *Id.* Because the government's case relied heavily on "equat[ing] the appellant's position [as an attorney] with knowledge of the conspiracy," we found it "easy to see why the jury was confused." *Id.* Yet the initial instructions "did not provide answers for the questions posed." *Id.* And as in *Bollenbach*, the questions had a clear legal answer: "It is well established that a person who sees a crime being committed has no legal duty to either stop it or report it." *Id.* at 1214.

So we reversed after holding that "[t]he jury should have been instructed in a way that there was no possibility that the conviction was based on an incorrect legal basis." *Id.* "Absent such an instruction," we noted, "the conclusion is inescapable that the jury may have convicted on an improper basis." *Id.* (citation modified). As we put it, "[t]here was confusion to say the least and it was plain error not to resolve it or attempt to do so." *Id.*

### 3.    *Duran*

In *United States v. Duran*, the government prosecuted Duran for possessing cocaine with intent to distribute it. 133 F.3d 1324, 1326 (10th Cir. 1998). The prosecution rested in part on the work of a confidential informant who arranged controlled buys from Duran. *Id.* Duran asserted an entrapment defense. *Id.* at 1327.

Over two days of deliberations, the jury sent five notes to the district court asking for additional materials and interpretations of the instructions. *Id.*

at 1328. The instructions had left the jury unsure whether the informant could be a government "agent" for entrapment purposes. *Id.* at 1326–27, 1329.

We found plain error in the district court's failure to supplement its instructions with a definition of the word "agent." *Id.* at 1334–35 & n.8. Doing so would have established that an "agent" was not limited to "someone working for the government, i.e., a government employee." *Id.* at 1335. After reviewing the record, we found it "clear that the jury was confused about the legal contours of the entrapment defense," *id.* at 1326, and "puzzled about [the informant's] status as a government agent," *id.* at 1329. That uncertainty collapsed "the heart of Duran's entrapment defense . . . because almost all of his contentions of government inducement involved conduct by" the informant. *Id.* at 1335. And "[u]nder the *Zimmerman* rule, a trial court must clarify jury confusion when jury questions indicate a possibility that a conviction would be 'based on an incorrect legal basis.'" *Id.* at 1334 (quoting *Zimmerman*, 943 F.2d at 1214). So we reversed. *Id.* at 1336.

### 4.   *Ness*

Contrast those decisions with one of our most recent, *United States v. Ness*, 124 F.4th 839 (10th Cir. 2024). Ness was charged with unlawful possession of a firearm and ammunition. *Id.* at 840–41. His indictment alleged that he possessed the firearm "[o]n or about" September 2021. *Id.* at 840. Per our pattern jury instructions, "on or about" meant "reasonably near the alleged date." *Id.* at 843.

17

The problem was that some of the government's evidence—video and photos of Ness shooting and holding the rifle charged in the indictment—was posted on social media in December 2020, nine months before the charged date. *Id.* at 841. Understandably, the jury sent a note asking "[h]ow far back" "on or about" extended. *Id.* at 843. The trial judge replied only that "[y]ou have all the evidence you need to render your verdict." *See id.* at 843–44. Ness was later found guilty. *Id.* at 840. On appeal, he argued that the judge's response might have led the jury to convict for uncharged conduct. *Id.*

We affirmed. Though we agreed the trial judge's answer was "nonresponsive," we disagreed that he should have redefined "on or about" beyond the pattern instruction's definition, "reasonably near." *See id.* at 844. We acknowledged that instructing that the offense had to be "reasonably near" the charged date wouldn't have removed the jury's uncertainty "with concrete accuracy." *See id.* at 845. But neither would the defendant's proposed supplemental instruction that "reasonably near" meant "within a few weeks." *See id.* at 840, 844 (citation modified). As we noted, "[o]n or about" means different things in different cases, making "reasonably near" the best available statement of law. *See id.* So the district court did not err by relying on its

original instructions rather than risking "inject[ing] more uncertainty into the jury's deliberations." *Id.* at 846.[6]

## B.    Jury Uncertainty at Kirby's Trial

Kirby's jury was obviously and reasonably uncertain about the meaning of the "under the influence" element. And the district court could have easily eliminated the uncertainty by supplementing the instructions with Oklahoma law defining that term. But it didn't. That was an abuse of discretion.

Recall that the district court instructed that for Kirby to be guilty on the government's "unlawful act" theory of involuntary manslaughter, the jury had to find that Kirby was driving "under the combined influence of alcohol and any other intoxicating substance which may render such person incapable of safely driving or operating a motor vehicle." R. vol. III at 25 (quoting Okla. Stat. tit. 47, § 11-902(A)(5)). Kirby didn't dispute the toxicologist's report, which showed that he had intoxicants in his system—a blood alcohol content of 0.028 percent, plus detectible amounts of other substances—after the motorcycle wreck. So the jury asked:

> When stating under the influence, does this mean that as long as it is in his system it is unlawful or do we need to determine if he was affected by substances to be impaired or unlawful?

R. vol. IV at 10.

---

[6] By contrast, the district courts in *Bollenbach*, *Zimmerman*, and *Duran* could have answered the juries' questions in a way that "cured the jury's uncertainty and avoided the possibility of an improper conviction." *See Ness*, 124 F.4th at 845. Those courts simply "chose not to." *See id.* at 844–45.

The jury was obviously unsure what "under the influence" meant. And its uncertainty is understandable. The jury could read the original instructions to mean either possibility it sought clarification about. Without clarification, the existing instructions were bound to leave an attentive jury uncertain.

The problem is the relative pronoun "which." Though usually nonrestrictive, here it is not preceded by a comma. A reasonable jury could decipher the instruction to require either of two things: (1) that the intoxicants influenced Kirby enough to render him incapable of safely driving his motorcycle, or (2) that the intoxicants merely be *able* to influence people enough to render them incapable of safely driving, whether or not they did so with Kirby. Hence the jury's note asking to clarify this exact point.

In no uncertain terms, our precedent spells out a district court's duty to cure a jury's uncertainty by informing the jury of the controlling law. *See Bollenbach*, 326 U.S. at 405 ("A conviction ought not to rest on an equivocal direction to the jury on a basic issue."); *Zimmerman*, 943 F.2d at 1214 ("The jury should have been instructed in a way that there was no possibility that the conviction was based on an incorrect legal basis."); *Duran*, 113 F.3d at 1334 ("[V]ague answers or mere exhortations to continue deliberating are plainly inadequate when the jury has demonstrated its misunderstanding of relevant legal principles . . . .").

And here—as in *Bollenbach*, *Zimmerman*, and *Duran*—the district court could have easily cured the jury's uncertainty. Oklahoma law is unambiguous:

ingesting intoxicating substances isn't the same as being "under the influence." That's been the law throughout the automotive age. *See, e.g.*, *Gault v. State*, 274 P. 687, 687–88 (Okla. Crim. App. 1929) (holding that "under the influence" is a phrase "of a similar import" as the word "drunk"). The DUI statutes weren't designed "to fasten guilt in the case of any and every 'influence'[] due to the use of intoxicating [substances,] however slight." *Luellen v. State*, 81 P.2d 323, 329 (Okla. Crim. App. 1938) (internal citation omitted). Rather, for someone to be guilty of driving "under the influence," the intoxicants he ingested must have affected his driving ability. *See, e.g.*, *Stewart v. State*, 372 P.3d 508, 515 (Okla. Crim. App. 2016); *Stanfield v. State*, 576 P.2d 772, 774 (Okla. Crim. App. 1978).

But affected how much? Oklahoma law answers that, too. Nearly ninety years ago, the Oklahoma Court of Criminal Appeals "searched the books" for "a fair definition" of "under the influence." *Luellen*, 81 P.2d at 329. The court settled on a state in which an intoxicant

> has so far affected the nervous system, brain or muscles of the driver of an automobile as to impair, to an appreciable degree, his ability to operate his car in the manner that an ordinarily prudent and cautious man, in the full possession of his faculties, using reasonable care, would operate or drive a similar vehicle under like conditions.

*Id.* (quoting *People v. Dingle*, 205 P. 705, 706–07 (Cal. Dist. Ct. App. 1922)).

Oklahoma courts have repeatedly approved that language for use in jury instructions. *See, e.g.*, *Phenis v. State*, 135 P.2d 62, 65 (Okla. Crim. App. 1943); *Stanfield*, 576 P.2d at 774; *Bernhardt v. State*, 719 P.2d 832, 833 & n.1

21

(Okla. Crim. App. 1986); *Slusher v. State*, 814 P.2d 504, 505 n.1 (Okla. Crim. App. 1991), *overruled on other grounds by Stewart*, 372 P.3d at 514; *Stewart*, 372 P.3d at 513–15. It even appears in the Oklahoma Uniform Jury Instructions. *See* OUJI-CR 6-35, notes on use; *see also Bernhardt*, 719 P.2d at 833 n.1; *Slusher*, 814 P.2d at 505 n.1; *cf.* OUJI-CR 6-18, main text and notes on use (instructing the elements of driving "under the influence of alcohol," stating that "under the influence" must be defined for that offense, and pointing to OUJI-CR 6-35 for a definition).

The government argues that these Oklahoma cases concern DUI charges other than Kirby's, which was driving "under the *combined* influence of alcohol *and any other intoxicating substance*." R. vol. I at 16 (emphasis added). True enough. *See, e.g.*, *Bernhardt*, 719 P.2d at 833 (driving under the influence of "intoxicating liquor"); *Stewart*, 372 P.2d at 510 (driving under the influence of drugs). And we acknowledge that, unlike the uniform instruction for driving under the influence of alcohol, *see* OUJI-CR 6-18, the uniform instruction for Kirby's charged offense does not refer to a definition requirement. *See* OUJI-CR 6-19.

But we find these differences irrelevant. At most, they reflect that juries in similar kinds of cases also struggled to understand what "under the influence" meant. *See, e.g.*, OUJI-CR 6-18, notes on use (citing *Bernhardt*, 719 P.2d at 833). The phrase is no clearer when it appears as "under the combined influence of alcohol and any other intoxicating substance." *See, e.g.*, *Stewart*,

22

372 P.3d at 513 (using the *Luellen* definition for the under-the-influence-of-drugs offense, Okla. Stat. tit. 47, § 11-902(A)(4), whose language mirrors Kirby's, *see id.* § 11-902(A)(5)). That it demands a definition in slightly different contexts just underscores its Rorschach-like quality.[7]

Contrary to the government's view, we aren't persuaded that the jury's uncertainty would be cured by other language in the charged Oklahoma DUI statute or in the adjacent jury instructions.

First, the government contends that, based on the definition of "influence," "the phrase 'under the combined influence' alerted the jury that the substances in [Kirby's] system had to affect him." Gov't's Resp. Br. at 12. The government then defines "influence" as "the power or capacity [to] caus[e] an effect in indirect or intangible ways." *Id.* (quoting *Influence*, Merriam-Webster, https://merriam-webster.com/dictionary/influence (visited June 7, 2025)).[8]

---

[7] Relying on our decision in *United States v. Sain*, the government also argues that Oklahoma's cases are owed "minimal weight" because "federal courts are not bound by [states'] interpretation[s] of assimilated statutes." Gov't's Resp. Br. at 15 (quoting 795 F.2d 888, 891 (10th Cir. 1986)). But *Sain* was referring to "specific provisions of state law [that] go beyond establishing the elements of an offense and the range of punishment." 795 F.2d at 890. That doesn't include elements' definitions, like that of "under the influence." *See* 18 U.S.C. § 1153(b); *United States v. Martinez*, 1 F.4th 788, 790 (10th Cir. 2021).

[8] The government relies on dictionary definitions as evidence of words' ordinary meanings. *See* Gov't's Resp. Br. at 12–13. We have no reason to think that the jury had access to dictionaries in this case. And whether a jury can even consider dictionary definitions not admitted into evidence poses a separate

*(footnote continued)*

23

This just restates the problem. True, "statutory language is given its ordinary, everyday meaning, unless the context suggests otherwise." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1212–13 (10th Cir. 2018) (citation modified). But the jury's question wasn't about whether the substances in Kirby's system had "the power or capacity [to] caus[e] an effect." It was about whether the substances needed to have caused the required effect on Kirby. Unless at least one juror doubted whether the substances rendered Kirby incapable of safely driving, the jury's question would have been unnecessary.

Second, the government argues that the term "intoxicating substance" "also indicated to the jury that [Kirby] had to be influenced by what he ingested." Gov't's Resp. Br. at 13. The government then defines "intoxicate" as "excite or stupefy by alcohol or a drug especially to the point where physical and mental control is markedly diminished." *Id.* (quoting *Intoxicate*, Merriam-Webster, https://merriam-webster.com/dictionary/intoxicate (visited June 7, 2025)).

This suffers from the same problem as "influence." The Oklahoma DUI statute uses "intoxicating" to modify "substance." *See* Okla. Stat. tit. 47, § 11-902(A)(5). Specifically, "intoxicating" describes a quality an ingested "substance" must have. But ingesting an "intoxicating substance" does not necessarily make one "intoxicated." Or, put another way: "intoxicating"

---

thorny legal question that we need not address. *See, e.g.*, *Mayhue v. St. Francis Hosp. of Wichita*, 969 F.2d 919, 924 & n.9 (10th Cir. 1992).

24

describes only a required quality of "substance," not a required quality of someone who ingests that substance. Indeed, the DUI statute's lone reference to the required qualities of *a person* is the phrase "under the . . . influence." So, like "influence," we read "intoxicating" to describe only a substance's potential effect, not its actual effect on a specific defendant who ingests it.

Third, the government points to the statute's ending clause: "which may render such person incapable of safely driving or operating a motor vehicle." Gov't's Resp. Br. at 13 (quoting Okla. Stat. tit. 47, § 11-902(A)(5)). The government insists that this "highlight[s] the type of 'intoxicating substance[s]' at issue—those that may have an impact on one's abilities." *Id.*

We again note the ambiguity of whether "which may render" refers to the term "any other intoxicating substance" or to the entire clause that begins with the word "influence." *See* Okla. Stat. tit. 47, § 11-902(A)(5). And either way, the "which may render" clause describes only what effect an intoxicating substance or influence "may" have—not what effect it must have had in this case. *See id.* So even if the government has a point about "intoxicating substance" and "influence" standing alone, the "which may render" clause still spawned ambiguity that called for the judge's clarification.

Fourth, having exhausted its arguments from the statutory text, the government turns to what it characterizes as a "clue" elsewhere in the jury instructions. Gov't's Resp. Br. at 14. Recall that the instructions twice invoke the Oklahoma DUI statute—first in the definition of involuntary manslaughter,

25

then in the elements of Oklahoma DUI. *See supra* note 3. The latter instruction

ends with this language:

> If you find that a chemical analysis of the Defendant's blood or breath was performed on a sample taken from the Defendant as soon as practical after the incident, then the results of this analysis may be considered by you as to the issue of whether the Defendant's ability to drive a motor vehicle was impaired.

R. vol. III at 27. The government asserts that the final prepositional phrase—

"as to the issue of whether the Defendant's ability to drive a motor vehicle was

impaired"—"definitively told the jury" that the "issue" it needed to decide was

"whether [Kirby's] driving abilities were impaired." Gov't's Resp. Br. at 14.

This language is less helpful than the government thinks. Even if we

accepted that the language hints at Kirby's impairment being a relevant issue,

the hint is buried at the end of a paragraph about when the jury can consider the

results of a chemical analysis. That's hardly a "concrete" indication that

impairment, not ingestion, is the controlling standard. *See Bollenbach*, 326 U.S.

at 613. So though we presume that juries follow their instructions, *e.g.*, *United*

*States v. Serrato*, 742 F.3d 461, 466 (10th Cir. 2014), here, the jury was unsure

*how* to follow them. And in that situation, merely "sprinkl[ing] the instructions

with clues" isn't enough. Kirby's Reply Br. at 8. Jurors "are not like pigs,

hunting for truffles buried in" their materials. *Cf. United States v. Garcia*, 74

F.4th 1073, 1092 n.9 (10th Cir. 2023). Jury instructions aren't a puzzle for

jurors to solve.

In sum, we hold that, unlike in *Ness*, the district court had "a clear legal answer" to the jury's question. 124 F.4th at 844. Under Oklahoma law, the intoxicants in Kirby's system had to have rendered him incapable of safely driving at the time of the accident. But instead of answering the jury's question, the court told the jury to revisit its original instructions. Unsurprisingly, this response failed to clear away the jury's difficulties "with concrete accuracy." *Bollenbach*, 326 U.S. at 612–13. That "clear error in judgment" was an abuse of the court's discretion. *See Clay*, 148 F.4th at 1190.

## II.    Harmless Error

We need not decide which harmless-error standard—constitutional or nonconstitutional—applies. The government cannot prove even by a preponderance that the district court's error didn't lead to Kirby's guilty verdict.

Kirby never disputed that he had alcohol and other intoxicants in his system after the motorcycle wreck. Had the jury felt that was enough for him to be "under the influence," it could have returned a guilty verdict. And if all the jurors had thought that the government proved beyond a reasonable doubt that Kirby was incapable of safely driving due to his intoxication level, the jury wouldn't have needed to send its note. It would have been ready to convict on both of its possible interpretations of "under the influence."

But the jury did send its note. So it's fair to assume that the jury was split on whether Kirby was so intoxicated that he could not capably drive. The

trial evidence summarized earlier was far from conclusive on that point. And after the district court declined to alleviate the jury's understandable uncertainty about "under the influence," the jury took just a few minutes to find Kirby guilty of involuntary manslaughter. Because that likely wasn't long enough for any holdouts to change their minds on the facts—whether Kirby was incapable of driving safely that night—the court's response probably made up the jurors' minds about what legal rule to apply. *See Bollenbach*, 326 U.S. at 614 (explaining that when jurors deliberate for "hours . . . unable to find guilt in the light of the main charge," then return a verdict "minutes after their inquiry was answered," it is "a long jump at guessing . . . that the jury did not rely on the [response] given them as a guide"). We are left with a strong feeling that the court's failure to cure the jury's uncertainty may have led to Kirby's conviction under an incorrect legal standard.[9]

## CONCLUSION

We vacate Kirby's conviction and remand for further proceedings.

---

[9] Again, the jury also unanimously rejected the government's alternate theory: that Kirby was guilty of involuntary manslaughter because he killed S.B. while committing a lawful act in an unlawful or careless manner. This further supports our sense that the jury didn't think Kirby was unable to drive safely.

*United States* v. *Kirby*, No. 24-7070
**ROSSMAN**, J., concurring

This appeal involves a dilemma familiar to district courts. On the one hand, the trial judge must clear away a jury's reasonable confusion "with concrete accuracy." *Bollenbach* v. *United States*, 326 U.S. 607, 613 (1946). On the other hand, the trial judge must ensure no communication with the jury misstates the law or misleads the jurors. *See United States* v. *Powell*, 226 F.3d 1181, 1193 (10th Cir. 2000) (identifying the "risk" that a district court might "caus[e] further confusion by answering a possibly misinterpreted question"). Indeed, a district court "may be properly concerned that a new instruction may itself introduce error or distort the instructions as a whole by overemphasizing a particular instruction." *United States* v. *Espinoza*, 338 F.3d 1140, 1146 (10th Cir. 2003).

"We are aware that the trial court faces a difficult task in attempting to respond to a jury's communication." *United States* v. *Walker*, 575 F.2d 209, 214 (9th Cir. 1978) (Kennedy, J.), *cert. denied*, 439 U.S. 931 (1978). "Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Bollenbach*, 326 U.S. at 612. This is a delicate balance—and one the district court in this case recognized and attempted to strike.

"We usually defer to the trial judge's discretion regarding matters of trial conduct." *Dansie* v. *Union Pac. R.R. Co.*, 42 F.4th 1184, 1199 n.8 (10th Cir.

2022) (quotation marks omitted). Under our precedent, answering a jury's question by referring the jury back to the instructions constitutes an abuse of discretion only in limited circumstances. Most obviously, a district court abuses its discretion if it refers the jury back to instructions that misstate the law. *See United States* v. *Duran*, 133 F.3d 1324, 1335 (10th Cir. 1998). A court also could abuse its discretion if the jury is reasonably confused about what can be described as a "central issue" in the case, *Dansie*, 42 F.4th at 1198 (quoting *United States* v. *Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018)), and that central issue has a "clear answer" not provided even in the legally correct instructions, *United States* v. *Ness*, 124 F.4th 839, 845 (10th Cir. 2024), *cert. denied*, 145 S. Ct. 2770 (2025); *see, e.g.*, *United States* v. *Zimmerman*, 943 F.2d 1204, 1213 (10th Cir. 1991). As we have explained, determining whether a trial judge is "required to clarify the charge and give a meaningful reply to a jury's inquiry depends on whether the question reveals a genuine confusion about a central issue in the case." *Com. Union Assur. Cos.* v. *Sears, Roebuck & Co.*, 716 F.2d 606, 609–10 (10th Cir. 1983); *see Shultz* v. *Rice*, 809 F.2d 643, 650 (10th Cir. 1986) ("[A] district judge has a duty to guide the jury toward an intelligent understanding of the legal and factual issues it must resolve, particularly when the jury asks a question revealing its confusion over the central issue of a case.").

2

This case is unusual. Mr. Kirby has not argued the jury instructions misstated the law. But, as even the government acknowledges, the jury was confused about a central issue: whether the government had to prove Mr. Kirby was impaired or instead merely had ingested an intoxicating substance to satisfy the "under the influence element" of the charged offense. That issue had a clear answer—the government must show impairment. Under the unique circumstances of this case, I agree that referring the jury back to the instructions was error. I write separately only to emphasize that, when answering a jury question, a district court ordinarily can refer the jury back to existing instructions. Nothing in the majority opinion should be read to suggest otherwise.